Mark D. Taylor (A9533)
**LEWIS | HANSEN**
The Judge Building, Suite 410
Eight East Broadway
Salt Lake City, Utah 84111-2239
Telephone:  (801) 746-6300
Facsimile:  (801) 746-6301
mtaylor@lewishansen.com

*Attorneys for Plaintiff Owners Insurance Company*

---

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH,

SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| AUTO-OWNERS INSURANCE COMPANY, a Michigan corporation<br><br>        Plaintiff,<br><br>    v.<br><br>PAPARAZZI, LLC, a Utah limited liability company; MISTY KIRBY, an individual; TRENT KIRBY, an individual; CHANTEL REEVE, an individual; and RYAN REEVE, an individual.<br><br>        Defendants. | **COMPLAINT FOR DECLARATORY RELIEF**<br><br>**JURY DEMANDED**<br><br>Case No.   4:23−cv−00027<br><br>Judge   David Nuffer |

Plaintiff Auto-Owners Insurance Company ("Auto-Owners") submits its complaint for declaratory judgment and jury demand as follows:

## NATURE OF THE ACTION

1.      Auto-Owners seeks a declaration of its rights, duties, and obligations in relation to Paparazzi, LLC ("Paparazzi"), Misty Kirby, Trent Kirby, Chantel Reeve and Ryan Reeve

("Founders") under a Tailored Protection Policy ("Liability Policy") and Commercial Umbrella Policy ("Umbrella Policy").

## PARTIES

2.     Auto-Owners is an insurance company organized under the laws of the State of Michigan with its principal place of business in the State of Michigan. Auto-Owners is licensed and authorized to transact business and to issue insurance policies in the State of Utah.

3.     Defendant Paparazzi is a limited liability company organized and existing under the laws of the State of Utah, with its principal place of business at 36 N 1000 W Hurricane, Utah 84737. Paparazzi's members are Misty Kirby, an individual and citizen of the State of Utah, Trent Kirby, an individual and citizen of the State of Utah, and Chantel Reeve, an individual and citizen of the State of Utah. Therefore, Paparazzi is a citizen of the State of Utah.

4.     Defendant Misty Kirby is a co-founder of Paparazzi and a citizen of the State of Utah.

5.     Defendant Trent Kirby is a co-founder of Paparazzi and a citizen of the State of Utah.

6.     Defendant Chantel Reeve is a co-founder of Paparazzi and a citizen of the State of Utah.

7.     Defendant Ryan Reeve is a co-founder of Paparazzi and a citizen of the State of Utah.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this matter under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

DN 7367102.3

9. Because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states as that term is defined in 28 U.S.C. § 1332, this Court has original jurisdiction in the matter pursuant to 28 U.S.C. § 1332(a)(1).

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendants are located in this judicial district.

## GENERAL ALLEGATIONS

## I.    THE PAPARAZZI ACTIONS

11. Beginning in April 2022, alleged consumers, purchasers, and consultants of Paparazzi products commenced legal actions, including the filing of putative class action complaints and counterclaims, against Paparazzi, as well as the Founders, related to Paparazzi's products ("Paparazzi Actions").

12. The Paparazzi Actions, which were filed in or have been transferred to the United States District Court for the District of Utah, include: *Tamie Hollins v. Paparazzi, LLC*, No. 2:22-cv-00553-DBB-PK, originally filed in the United States District Court for the Northern District of New York ("*Hollins* Action") (Complaint attached as Exhibit 1); *Crystal Johnson et al. v. Paparazzi, LLC*, No. 2:22-cv-00439-DBB-PK, originally filed in the United States District Court for the Eastern District of North Carolina ("*Johnson* Action") (Complaint attached as Exhibit 2); *Irene Burgess v. Paparazzi, LLC*, No. 2:22-cv-00538-DBB-PK, originally filed in the United States District Court for the Eastern District of California ("*Burgess* Action") (Complaint attached as Exhibit 3); *Heather Gilbert v. Paparazzi LLC*, No. 2:22-cv-00484-DBB-PK, originally filed in the United States District Court for the Eastern District of Michigan ("*Gilbert* Action") (Complaint attached as Exhibit 4); *Lori Teske and Terri Franklin v. Paparazzi, LLC, et*

DN 7367102.3

*al.*, No. 4:22-cv-00035-DBB-PK ("*Teske* Action") (Complaint attached as Exhibit 5); and counterclaims filed by Geraldine Souza, Jaime Robinson and Jennifer Carrol in the action titled *Paparazzi, LLC dba Paparazzi Accessories, LLC v. Melissa Sorenson, et al.*, No. 4:22-cv-00028-DBB-PK ("*Souza* Counterclaims") (Counterclaims attached as Exhibit 6).

A.     The *Hollins* Action

13.     The *Hollins* Action alleges that Paparazzi is a multi-level marketing business that sells jewelry and other accessories wholesale in bulk to consultants. (Ex. 1 ¶ 1.)

14.     The *Hollins* Action alleges that, while Paparazzi represented and expressly warranted that its products are "lead-free and nickel-free," it sourced and sold jewelry containing detective levels of lead, nickel, and other heavy metals. (*Id.* ¶ 2.)

15.     The *Hollins* Action alleges that Paparazzi promoted its products as "lead-free and nickel-free" on its website as of November 9, 2021, but since removed such representations between November 20, 2021 and January 9, 2022. (*Id.* ¶¶ 3, 15.)

16.     The *Hollins* Action alleges that nickel and lead may pose health problems to consumers of products containing such metals. (*See id.* ¶¶ 18-25.)

17.     The *Hollins* Action alleges that Paparazzi engaged in "deceptive and unlawful acts and practices." (*Id.* ¶ 71.) It further alleges that Paparazzi "acted intentionally, knowingly, and maliciously." (*Id.* ¶ 69.)

18.     The *Hollins* Action alleges that certain putative class members sustained "substantial injury." (*Id.* ¶ 72.)

19.     The *Hollins* Action defines its nationwide class as "[a]ll persons who purchased Paparazzi Products in the United Stated within the Relevant Time Period." (*Id.*, ¶ 27.)

DN 7367102.3

20.    The *Hollins* Action asserts claims for: (i) negligence, (ii) strict product liability, (iii) unjust enrichment, and (iv) violations of New York General Business Law.

**B.    The *Johnson* Action**

21.    The *Johnson* Action alleges that Paparazzi's marketing was "conspicuously saturated with" claims that Paparazzi's products were "lead and nickel free," among other claims. It further alleges that, contrary to those marketing messages, Paparazzi's products "do in fact contain significant amounts of lead and nickel." (Ex. 2 ¶¶ 3-4.)

22.    The *Johnson* Action alleges that Paparazzi made "lead and nickel free" claims "in order to misleadingly create the impression" that its products "are safer and of a higher level of quality than they are in reality." (*Id.* ¶ 6; *id.* ¶ 62.) *Johnson* alleges that Paparazzi customers "discovered" that these "claims were untrue" not later than "late 2021 or early 2022." (*Id.* ¶ 7.)

23.    The *Johnson* Action alleges that Paparazzi's "false statements, misrepresentations and material omissions about the presence of lead and nickel in its Products are intentional and designed to induce customers to purchase its Products." (*Id.* ¶ 9.) Plaintiffs in the *Johnson* Action claim that they relied on these false statements and "have suffered injury in fact, including economic damages." (*Id.* ¶ 14.)

24.    The *Johnson* Action alleges that "[c]hildren who wore Paparazzi's Starlet Shimmer Products were unnecessarily put at risk of suffering" adverse affects, "as well as serious risk to their health. Nickel and lead pose even more harm if children mouth, chew or swallow these materials." (*Id.* ¶ 65.)

25.    The *Johnson* Action alleges that Paparazzi engaged in "a deliberate and willful pattern of conduct, including taking affirmative measures, aimed at deceiving consumers . . . into

DN 7367102.3

believing that the Products are free of these materials which are shown to cause adverse effects and are of a lesser quality than other materials used to make jewelry." (*Id.* ¶ 71.)

26.    The *Johnson* Action alleges, "At all relevant times, [Paparazzi] knew the true nature of the materials contained in the Products, but nevertheless marketed, advertised and sold the Products without disclosing this material information in an effort to persuade consumers that they were, in fact, buying Products that were free of lead and nickel." (*Id.* ¶ 72; *see id.* ¶¶ 80-82.) It further alleges that Paparazzi "was aware of the deception in its marketing, advertising, and sale of the Products," (*id.* ¶ 84), and that it has "fraudulently concealed the fact that its Products contain lead and nickel." (*Id.* ¶ 85; *see also id.* ¶¶ 87, 89, 177.)

27.    The claims in the *Johnson* Action involve spans of time as early as 2013. (*Id.* ¶ 102.)

28.    The *Johnson* Action defines its nationwide class as, "[d]uring the fullest period allowed by law, all persons who purchased any of Paparazzi's Products in the United States for personal use and not for resale." (*Id.*, ¶ 155.)

29.    The *Johnson* Action asserts claims for: (i) breach of express warranty, (ii) breach of implied warranty, (iii) violation of the North Carolina Unfair and Deceptive Trade Practices Act, (iv) negligent misrepresentation, (v) unjust enrichment, and (vi) violation of NC Gen Stat § 25-2-313 North Carolina's breach of express warranty statute.

### C.    The *Burgess* Action

30.    The *Burgess* Action alleges that Paparazzi "is a multi-level marketing business that sells jewelry and other accessories wholesale in bulk to consultants, who then sell the jewelry and other accessories to consumers." (Ex. 3, ¶ 7.)

DN 7367102.3

31.    The *Burgess* Action alleges, "[d]espite earlier representations and express warranties stating that [Paparazzi's] products are 'lead-free and nickel-free,' [Paparazzi] designed, sources, and sold jewelry that allegedly contained detectable levels of lead and nickel, among other heavy metals." (*Id.* ¶ 8; *see id.* ¶¶ 15-16, 18, 64.)

32.    The *Burgess* Action alleges that nickel and lead may pose health problems to consumers of products containing such metals. (*See id.* ¶¶ 10-11, 19-26.)

33.    The *Burgess* Action alleges that the plaintiff regularly purchased Paparazzi's products for personal use between September 2018 and May 2019. (*Id.* ¶ 28.) It further alleges that the plaintiff began experiencing allergic reaction where she wore the products, and has suffered economic damages related to the purchase of the products. (*Id.*) It alleges that Paparazzi "exposed consumers to risk of injury." (*Id.* ¶ 31.)

34.    The *Burgess* Action alleges that Paparazzi "had actual knowledge that the marketing, packaging, and labeling of the Products was deceptive and misleading because the Products undergo regular testing for all heavy metals including lead, nickel, and cadmium." (*Id.* ¶ 29.) It further alleges that, "[d]espite the fact that tests have shown the presence of heavy metals such as lead, nickel, and cadmium, [Paparazzi] continued to market the Products as being free of heavy metals and 'lead-free and nickel-free'." (*Id.* ¶ 30; *see id.* ¶¶ 32-33.)

35.    The *Burgess* Action alleges that "[d]espite its knowledge of the defective design and danger of the product when used as intended, [Paparazzi] failed to disclosed and actively concealed the material information." (*Id.* ¶ 37.) It alleges that "[t]he purpose of [Paparazzi's] active concealment of the dangers of the Products was to continue to profit from the sale of the Products and to prevent Plaintiff and other Class members from seeking redress." (*Id.* ¶ 38.)

7

36.     The *Burgess* Action defines its nationwide class as "[a]ll persons who purchased [Paparazzi] Products in the United Stated within the Relevant Time Period." (*Id.* ¶ 49.)

37.     The *Burgess* Action asserts claims for: (i) negligent misrepresentation, (ii) fraudulent misrepresentation, (iii) restitution, (iv) violations of the California Consumer Legal Remedies Action; (v) false advertising under the California False Advertising Law; and (vi) unlawful, unfair, or fraudulent business practices under the California Unfair Competition Law.

### D.     The *Gilbert* Action

38.     The *Gilbert* Action alleges that Paparazzi is a multi-level marketing business, in which it recruits salespersons to market and sell its jewelry and other accessories to consumers for a commission. (Ex. 4 ¶ 21.)

39.     The *Gilbert* Action alleges that Paparazzi's marketing and sales strategy was to prominently promote its products as "lead and nickel free" in order to misleadingly create the impression that its products are safer and of a higher level of quality than they are in reality. (*Id.* ¶¶ 2, 6.) However, it further alleges that independent testing revealed that Paparazzi's "lead and nickel free" claims were untrue, and that its products do in fact contain significant amounts of lead and nickel, in "late 2021 or early 2022." (*Id.* ¶¶ 4-7.) The *Gilbert* Action alleges that Paparazzi removed the claims that its products are lead and nickel free on or about December 2021 or early 2022. (*Id.* ¶ 29.)

40.     The *Gilbert* Action alleges Paparazzi acted intentionally: "Defendant's false statements, misrepresentations and material omissions about the presence of lead and nickel contained in its Products are intentional and designed to induce customers to purchase its Products." (*Id.* ¶ 9.) It further alleges that Paparazzi "actively and intentionally concealed the

8

existence of the lead and nickel and failed to inform Plaintiffs or proposed Class Members of the existence of the lead and nickel in the Products." (*Id.* ¶ 85.)

41.    The *Gilbert* Action alleges that the plaintiffs relied on Paparazzi's false statements and "have suffered injury in fact, including economic damages." (*Id.* ¶ 14.)

42.    According to the complaint in the *Gilbert* Action, "[Paparazzi] conceals, suppresses or omits the fact that its Products contain lead and nickel." (*Id.* ¶ 63.) The *Gilbert* plaintiffs allege "a deliberate and willful pattern of conduct, including taking affirmative measures, aimed at deceiving consumers . . . into believing that the Products are free of these materials which are shown to cause adverse effects and are of a lesser quality than other materials used to make jewelry." (*Id.* ¶ 67.)

43.    The *Gilbert* Action alleges that Paparazzi "knew the true nature of the materials contained in the Products, but nevertheless marketed, advertised and sold the Products without disclosing this material information in an effort to persuade consumers that they were, in fact, buying Products that were free of lead and nickel." (*Id.* ¶ 68; *see also id.* ¶¶ 76-78.) The *Gilbert* Action alleges that Paparazzi "was aware of the deception in its marketing, advertising, and sale of the Products" and "has fraudulently concealed the fact that its Products contain lead and nickel." (*Id.* ¶¶ 80-81; *see also id.* ¶ 83.)

44.    The *Gilbert* Action plaintiff alleges she began purchasing products from Paparazzi beginning in or around 2018 and continuing until approximately 2020. (*Id.* ¶ 98.)

45.    The *Gilbert* Action defines its nationwide class as "[d]uring the fullest period allowed by law, all persons who purchased any of Paparazzi's Products in the United States for personal use and not for resale." (*Id.* ¶ 110.)

DN 7367102.3

46.     The *Gilbert* Action asserts claims for: (i) breach of express warranty, (ii) breach of implied warranty, (iii) violation of the Michigan Consumer Protection Act, (iv) negligent misrepresentation, (v) unjust enrichment, (vi) violation of MCL 440.2313; Michigan's breach of express warranty statute, and (vii) violation of MCL 440.2314; Michigan's breach of implied warranty statute.

**E.      The *Teske* Action**

47.     The *Teske* Action alleges that Paparazzi is a "multilevel-marketing company that used a nationwide network of sellers, or 'Consultants,' to peddle low-budget jewelry and accessory items laces with high levels of toxic contaminant, first to its national network of sellers, who were then saddles with huge amounts of unsellable and dangerous products." (Ex. 5 ¶ 1.)

48.     The *Teske* Action alleges that Paparazzi "falsely represented to its sellers … that its jewelry and accessories were 'lead and nickel free' and were in compliance with state rules limiting the amount of dangerous toxins in consumer products." (*Id*.) The complaint alleges that Paparazzi's jewelry "contains astonishingly high levels of lead, nickel, cadmium, and/or other toxic metals." (*Id*.) It further alleges that some of the products tested for high levels of mercury and arsenic as well. (*Id*. ¶ 47.)

49.     *Teske* alleges that Paparazzi directly advertised that all of its products are "Lead-free and nickel-free" beginning on October 18, 2018, if not earlier. (*Id*. ¶ 39.)

50.     Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve (the "Founders") are alleged to be Paparazzi co-founders, and are also named as defendants in the *Teske* Action. (*Id*. ¶¶ 25-28.)

DN 7367102.3

51.    The *Teske* Action alleges that Paparazzi and the Founders "knew of the . . . false representations of quality and ongoing sale of Paparazzi's products with dangerous levels of lead and nickel." (*Id*.; *see also id.* ¶ 101.)

52.    The *Teske* Action alleges that Paparazzi's conduct was "deliberate, willful, and intentional." (*Id*. Prayer For Relief.)

53.    The *Teske* Action alleges that the plaintiffs have suffered "irreparable injury," (*id*. ¶ 80), and suffered "economic and reputational damages." (*Id*. ¶ 68.)

54.    According to the complaint, Lori Teske signed up to be a "consultant" on October 24, 2020 and purchased products through November 2021. (*Id*. ¶¶ 13-17.) Terri Franklin signed up to be a consultant on June 30, 2019, and purchased and sold jewelry until October 2021. (*Id*. ¶¶ 18-20.)

55.    The *Teske* Action defines its nationwide class as "[a]ll Paparazzi Consultant who sold Paparazzi accessories from the beginning of any applicable statute of limitations period until December 16, 2021." (*Id.* ¶ 65.)

56.    The complaint in the *Teske* Action contains no allegation that plaintiffs or the Paparazzi "consultants" are or were employees of Paparazzi.

57.    The *Teske* Action asserts claims for: (i) violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)), (ii) breach of implied warranty (Utah Code § 70A-2314), (iii) breach of contract, and (iv) breach of covenant of good faith and fair dealing.

**F.    The *Souza* Counterclaims**

58.    Counterclaim Plaintiffs Geraldine Souza, Jaime Robinson and Jennifer Carrol asserted counterclaims against Paparazzi and the Founders in an action titled *Paparazzi, LLC*

*d/b/a Paparazzi Accessories, LLC v. Melissa Sorenson, et al.*, No. 4:22-cv-00028-DBB-PK. (Ex. 6.)

59.     The *Souza* Counterclaims allege that Paparazzi is a multi-level marketing company that sells jewelry and accessories, and relies on a network of salespeople, known as "consultants," to do so. (*Id.* ¶¶ 12-13.)

60.     The *Souza* Counterclaims allege that, since 2017, Paparazzi directly advertised to consumers and consultants, both on its website and promotional materials, that its jewelry and accessories were "lead-free and nickel-free." (*Id.* ¶ 29.)

61.     The *Souza* Counterclaims allege that Paparazzi's representations were false, and that Paparazzi products contained unsafe levels of known toxins, including lead, nickel, cadmium, arsenic, and mercury. (*Id.*, ¶¶ 37-40.) It further claims that wearing jewelry and accessories containing these toxins can cause adverse health effects. (*Id.* ¶ 45.)

62.     The *Souza* Counterclaims allege that "Paparazzi induced each of the Counterclaim Plaintiffs to purchase its products, based, in part, on its representations hat the products are safe and otherwise free from harmful materials such as lead and nickel." (*Id.* ¶ 43.)

63.     The *Souza* Counterclaims allege that the Founders "knew of Paparazzi's false representations, knew that Paparazzi's jewelry and accessories contained toxic metals, including lead and nickel, and intentionally and recklessly disregarded those dangers to unjustly enrich Paparazzi and its Founders at the expense and safety of consumers such as Counterclaim Plaintiffs." (*Id.* ¶¶ 48-51.)

DN 7367102.3

64.     The *Souza* Counterclaims allege that, based on Paparazzi's representations, the counterclaim plaintiffs "paid millions of dollars to Paparazzi for jewelry and accessories, both for personal use and for resale through Paparazzi's pyramid scheme." (*Id.* ¶ 52.)

65.     The *Souza* Counterclaims that the counterclaim plaintiffs "have been and continue to be injured by Paparazzi's false or misleading representations through the diversion of sales, reputational harm, and loss of goodwill." (*Id.* ¶ 65.) It further alleges that Paparazzi knew that its representations of fact were false or misleading. (*Id.* ¶¶ 66, 117, 130.)

66.     The *Souza* Counterclaims alleges, "[a]s purchasers of Paparazzi's 'consumer products,' Counterclaim Plaintiffs are 'consumers.' (*Id.* ¶¶ 96, 107.)

67.     The *Souza* Counterclaims assert counterclaims for: (i) violation of Utah's Pyramid Scheme Act, Utah Code § 76-6a-1 et seq., (ii) violation of Lanham Act, 15 U.S.C. § 1051 et seq., (iii) violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq., (iv) violation of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41 et seq., (v) violation of the Idaho Consumer Protection Act, Idaho Code § 48-601 et seq., (vi) violation of the Utah Consumer Sales Practices Act, Utah Code § 13-11-1 et seq., (vii) breach of express warranty, Utah Code Title 70A, 15 U.S.C. §§ 2301 et seq., (viii) breach of implied warranty, Utah Code Title 70A, 15 U.S.C. §§ 2301 et seq., (ix) violation of California False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq., (x) fraudulent misrepresentation, (xi) negligent misrepresentation.

13

## II.        THE POLICIES

### A.        The Liability Policy

68.        Auto-Owners issued the "Liability Policy", policy number 57590888, to named insured Paparazzi.

69.        The Liability Policy was in effect from November 1, 2021 to November 1, 2022.

70.        The Limit of Liability for the Liability Policy is $1,000,000 for each occurrence, $1,000,000 for personal and advertising injury, and $2,000,000 in the general aggregate.

71.        The Liability Policy's insuring agreement provision for coverage for bodily injury and property damage (Coverage A) states, in relevant part:

**SECTION I - COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. We may at our discretion investigate any claim or "occurrence" and settle any claim or "suit" that may result. But:
>
> > **(1)** The amount we will pay for damages is limited as described in Section **III** - Limits of Insurance; and
> >
> > **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage **A** or **B** or medical expenses under Coverage **C**.
> >
> > No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

14

**b.** This insurance applies to "bodily injury" and "property damage" only if:

>**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

>**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

>**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

>**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

>**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

>**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**d.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

72.    The Liability Policy contains the following exclusions applicable to Coverage A:

**2. Exclusions**

This insurance does not apply to:

15

### a.  Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. However, if the insurance under this policy does not apply to the liability of the insured, it also does not apply to such liability assumed by the insured under an "insured contract".

**(2)** That the insured would have in the absence of the contract or agreement.

***

### f. Pollution

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

16

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property

17

damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory

18

requirement, or such claim or "suit" by or on behalf of a governmental authority.

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

73.     The Liability Policy's insuring agreement provision for coverage for

personal and advertising injury (Coverage B) states, in relevant part:

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

74.     The Liability Policy contains the following exclusions applicable to

Coverage B:

DN 7367102.3

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another** "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

\*\*\*

**e. Contractual Liability** "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract** "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements** "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

\*\*\*

**m. Pollution** "Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related** Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

DN 7367102.3

75.     The Liability Policy contains the following definitions which are applicable to

Coverage A and Coverage B:

### SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

> **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

> **b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

> \*\*\*

**3.** "Bodily injury" means bodily injury, bodily sickness or bodily disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

> **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

> **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

> **c.** All other parts of the world if the injury or damage arises out of:

>> **(1)** Goods or products made or sold by you in the territory described in **a.** above;

>> **(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

>> **(3)** "Personal injury" or "advertising injury" offenses that take place through the Internet or similar electronic means of communication

DN 7367102.3

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

\*\*\*

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement; or

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

22

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

\*\*\*

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement"

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

\*\*\*

DN 7367102.3

**17.** "Property damage" means:

> **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> **b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

> For the purposes of this insurance, electronic data is not tangible property.

> As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

> **21.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

> **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

> **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

> **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

> **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

***

**26.** "Your product":

> **a.** Means:

24

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    **(a)** You;

    **(b)** Others trading under your name; or

    **(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**B.**    **EPL Endorsement**

76.    The Liability Policy also contains an employment practices liability coverage endorsement ("EPL Endorsement").

77.    The EPL Coverage Period was from November 1, 2021 to November 1, 2022, and has a Retroactive Date of November 1, 2019.

78.    Coverage under the EPL Endorsement is subject to an aggregate limit of $1,000,000.

79.    Based on the information provided to Auto-Owners, the Declarations page acknowledges that Paparazzi has 316 full-time employees and 0 part-time employees.

DN 7367102.3

80.    The EPL Endorsement contains, in relevant part, the following insuring

agreement:

## UTAH – EMPLOYMENT PRACTICES LIABILITY INSURANCE COVERAGE ENDORSEMENT

### SECTION I. WHAT IS COVERED

**A. Insuring Agreement**

   **1.** We shall pay those "losses" arising out of an insured's "wrongful employment act" against your "employees", "recognized volunteers" and "applicant for employment to which this insurance applies. The "wrongful employment acts" must commence or take place after the Retroactive Date shown on the Declarations, but before the end of the "EPL coverage period". . . A "claim" or "suit" for a "wrongful employment act" must be first made against you during the "EPL coverage period" or any Extended Reporting Period (if applicable) and reported pursuant to the terms of this EPL Coverage Endorsement.

81.    The following exclusions apply to coverage under the EPL Endorsement:

### SECTION II. EXCLUSIONS – WHAT IS NOT COVERED

This insurance does not apply to:

**A. Profit or Advantage**

Any gaining of any profit or advantage to which an insured was not legally entitled. However, to the extent that a "claim" or "suit" is otherwise covered under this EPL Coverage Endorsement, we will defend a "claim" or "suit" asserting that an insured gained a profit or advantage to which the insured was not legally entitled until such time as the insured is determined to have gained a profit or advantage to which the insured was not legally entitled.

**B. Criminal Acts**

Any liability arising out of any dishonest, fraudulent, criminal, or malicious act by or at the direction of any insured. However, to the extent that a "claim" or "suit" is otherwise covered under this EPL Coverage Endorsement we will defend a "claim" or "suit" asserting a dishonest, fraudulent, criminal or malicious act until such time as the insured is determined to have committed such dishonest, fraudulent, criminal or malicious act.

DN 7367102.3

The "wrongful employment act(s)" of an insured shall not be imputed to any other insured for the purpose of determining the applicability of the foregoing Exclusions **A.** and **B.**

### C. "Property Damage"

Any "property damage".

### D. "Bodily Injury"

Any "bodily injury".

Except that this exclusion does not apply to any "claim" for emotional distress arising out of "wrongful employment acts" as defined in **SECTION VII. DEFINITIONS**.

\*\*\*

### F. Contractual Liability

Any liability arising out of any actual or alleged contractual liability of any insured under any express contract or agreement. This exclusion shall not apply to any liability the insured would have in the absence of such express contract or agreement.

\*\*\*

### J. Prior Knowledge

Any liability arising out of incidents, circumstances or "wrongful employment acts", to which an insured:

**1.** Had knowledge of; or

**2.** Could have reasonably foreseen might result in a "claim" or "suit"

and which were known to the insured prior to the effective date of this EPL Coverage or the EPL Coverage issued by us for which this EPL Coverage is an uninterrupted renewal.

82.     Section IV. Limit of Liability of the EPL Endorsement states the following:

## *SECTION IV. LIMIT OF LIABILITY (including "defense costs")*

**A.**  *The Aggregate EPL Limit of Liability shown in the Declarations and this section limits the most we shall pay for all "loss" for this coverage (other than post-judgment interest described*

27

*in **SECTION I., B., 7.**) arising out of "claims" and "suits" first made against insureds during the "EPL coverage period" or Extended Reporting Periods (if applicable), regardless of:*

***1.*** *The number of persons or organizations;*

***2.*** *The number of "claims" made or "suits" brought; or*

***3.*** *The length of the "EPL coverage period".*

***B.*** *The Aggregate EPL Limit of Liability is the most we shall pay for all "losses" (other than post-judgment interest described in **SECTION I., B., 7.**) covered under this EPL Coverage Endorsement, including amounts incurred for "defense costs".'*

\*\*\*

***D.*** *All "claims" and "suits" arising from the same or "related wrongful employment acts" shall be treated as arising out of a single "wrongful employment act".*

***E.*** *All "claims" or "suits" arising out of one "wrongful employment act" shall be deemed to be made on the date that the first such "claim" is made or "suit" is brought. All "claims" asserted in a "class action suit" will be treated as arising out of a single "wrongful employment act".*

\*\*\*

83.    The EPL Endorsement contains the following applicable definitions:

**SECTION VII. DEFINITIONS**

**A.** "Bodily injury" means physical injury, sickness, or disease sustained by a person, including death resulting from any of these at any time.

**B.** "Claim" means a written demand for money. The term "claim" shall also mean an Equal Employment Opportunity Commission (EEOC), Department of Labor (DOL) or Office of Federal Contract Compliance Program (OFCCP) (or similar federal, state or local agency) proceeding or investigation commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to you. In no event, shall the term "claim" include any labor or grievance proceeding, which is subject to a collective bargaining agreement.

**C.** "Class action suit" means any "suit" seeking certification or certified as a class action by a federal or state court.

\*\*\*

**F.** "Employee" means an individual whose labor or service is engaged by and directed by you for remuneration, whether such individual is in a supervisory, co-worker or

DN 7367102.3

subordinate position or otherwise, including any part-time, seasonal and temporary "employees". "Employee" also means any independent contractor or a "leased worker" who is treated under applicable law as an "employee" of the Company, which shall be determined at the time of the "wrongful employment act".

\*\*\*

**I.** "Loss(es)" means monetary damages to which this insurance applies and which you are legally obligated to pay (including front pay and back pay), judgments, settlements, pre- and post-judgment interest on that part of any judgment paid by us, statutory attorney fees, and "defense costs", however, "loss" shall not include:

**1.** Civil or criminal fines or penalties imposed by law;

**2.** Taxes;

**3.** Employment related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation;

**4.** Any liability or costs incurred by any insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar; or

**5.** Matters which may be deemed uninsurable under the law pursuant to which this EPL Coverage shall be construed.

Where permitted by law, "loss" shall include punitive or exemplary damages imposed upon any insured (subject to the terms, conditions and exclusions of this EPL Coverage Endorsement)

\*\*\*

**K.** "Property damage" means physical injury to, or destruction of, tangible property including the loss of use thereof, or loss of use of tangible property, which has not been physically injured or destroyed.

\*\*\*

**M.** "Related wrongful employment acts" means "wrongful employment acts" which are the same, related or continuous, or "wrongful employment acts" which arise from a common nucleus of facts. "Claims" or "suits" can allege "related wrongful employment acts", regardless of whether such "claims" or "suits" involve the same or different claimants, insureds or legal causes of actions.

\*\*\*

29

**Q.** "Wrongful employment act" means any actual or alleged:

    **1.** Wrongful dismissal, discharge or termination (either actual or constructive), including breach of an implied contract;

    **2.** Harassment (including sexual harassment, whether quid pro quo, hostile work environment or otherwise);

    **3.** Discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy of disability);

    **4.** "Retaliation" (including lockouts);

    **5.** Employment-related misrepresentation(s) to your "employee", "recognized volunteer" or applicant for employment with you;

    **6.** Employment-related:

        **a.** Libel, slander or defamation;

        **b.** Humiliation;

        **c.** Mental anguish;

        **d.** Invasion of privacy; or

        **e.** Intentional infliction of emotional distress;

    **7.** Wrongful failure to employ or promote;

    **8.** Wrongful deprivation of career opportunity, wrongful demotion or negligent "employee" evaluation, including the giving of negative or defamatory statements in connection with an "employee" reference;

    **9.** Wrongful discipline;

    **10.** Failure to provide or enforce adequate or consistent policies and procedures relating to any "wrongful employment act";

    **11.** Negligent supervision or hiring by an insured, relating to any of the above; or

    **12.** Violation of an individual's civil rights relating to **1.** through **11.** above.

### C. The Umbrella Policy

84. Auto-Owners issued the Umbrella Policy, policy number 52-572263-01, to named insured Paparazzi.

85. The Umbrella Policy was in effect from November 1, 2021 to November 1, 2022.

86. The Limit of Liability for the Umbrella Policy is $20,000,000 in the aggregate.

DN 7367102.3

87.    The Umbrella Policy's insuring agreement states as follows in relevant part:

## INSURING AGREEMENT

**We** agree to provide insurance relying on the statements in the Declarations and subject to all the terms and conditions of this policy. In return, **you** must pay the premium and comply with all policy terms and conditions.

\*\*\*

## COVERAGE

**A. We** will pay those sums included in **ultimate net loss** that the insured becomes legally obligated to pay as damages because of:

**1. Bodily injury**;

**2. Property damage**;

**3. Personal injury**; or

**4. Advertising injury**

to which this insurance applies caused by an **incident**.

**B.** If the basis of coverage for an **incident** is:

**1.** An occurrence:

**a.** The **bodily injury** and **property damage** must take place during the policy term; and

**b.** The **incident** must take place in the **policy territory**; and

**c.** This insurance applies to **bodily injury** and **property damage** only if:

**(1)** Before the beginning of the policy term shown in the Declarations, none of the following persons knew that the **bodily injury** or **property damage** had occurred in whole or in part:

**(a)** If **you** are designated in the Declarations as an individual, **you** and **your** spouse.

31

DN 7367102.3

**(b)** If **you** are designated in the Declarations as a partnership or joint venture, **your** members and **your** partners and their spouses.

**(c)** If **you** are designated in the Declarations as a limited liability company, **your** members.

**(d)** If **you** are designated in the Declarations as an organization other than a partnership, joint venture or limited liability company, **your executive officers** and directors.

**(e) Your** employee authorized by you to give or receive notice of an incident.

If any of the above persons knew prior to the policy term that the **bodily injury** or **property damage** occurred, then any continuation, change or resumption of such **bodily injury** or **property damage** during or after the policy term will be deemed to have been known before the beginning of the policy term shown in the Declarations.

**(2) Bodily injury** and **property damage** will be deemed to have been known to have occurred at the earliest time when any person shown in **c.(1)(a)** through **c.(1)(e)** immediately above:

**(a)** Reports all, or any part, of the **bodily injury** or **property damage** to **us** or any other insurer;

**(b)** Receives a written or verbal demand or claim for damages because of the **bodily injury** or **property damage**; or

**(c)** Becomes aware by any other means that **bodily injury** or **property damage** has occurred or has begun to occur.

**2.** An offense:

DN 7367102.3

        **a.** The **personal injury** and **advertising injury** must be committed during the policy term; and

        **b.** The **incident** must take place in the **policy territory**.

88.    The Umbrella Policy contains, in relevant part, the following exclusions:

This policy does not apply to:      **\*\*\***

**F.**    **1. Bodily injury** arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of , or ingestion of, asbestos or asbestos related particles, dust, irritants, contaminants, **pollutants**, toxic elements or materials.

    **2. Property damage** arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, asbestos or asbestos related particles, dust, irritants, contaminants, **pollutants**, toxic elements or materials.

    **3. Personal injury** or **advertising injury** arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of , ingestion of, contact with, exposure to, existence of, or presence of, asbestos or asbestos related particles, dust, irritants, contaminants, **pollutants**, toxic elements or materials.

    **4.** Any loss, cost or expense arising, in whole or in part, out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, asbestos or asbestos related particles, dust, irritants, contaminants, **pollutants**, toxic elements or materials, by any insured or any other person or entity.

      **\*\*\***

**J.**    **1. Bodily injury**, **property damage**, **personal injury** or **advertising injury** arising out of the actual, alleged or threatened discharge, dispersal, release, escape, seepage or migration of **pollutants**.

    **2.** Any loss, cost or expense arising out of any:

        **a.** Request, demand, order or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove,

DN 7367102.3

contain, treat, detoxify or neutralize, or in any way respond to or assess, the effects of **pollutants**; or

**b.** Claim or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing, the effects of **pollutants**.

\*\*\*

**M. Bodily injury** or **property damage** expected or intended from the standpoint of the **insured**. This exclusion does not apply to **bodily injury** resulting from the use of reasonable force to protect persons or property.

\*\*\*

**Q. Bodily injury** or **property damage** for which the **insured** is obligated to pay damages by reason of assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**1.** Assumed in a contract or agreement that is an **insured contract**, provided such **bodily injury** or **property damage** occurs subsequent to the execution of the contract or agreement. However, if the insurance under this policy does not apply to the liability of the **insured**, it also does not apply to such liability assumed by the **insured** under and **insured contract**; or

**2.** That the **insured** would have in the absence of the contract or agreement.

**R. Personal injury** or **advertising injury**:

**1.** Caused by or at the direction of any **insured** with the knowledge that the act would violate the rights of another and would inflict **personal injury** or **advertising injury**; or

**2.** Expected or intended by any **insured**. This exclusion R.2., does not apply to **personal injury**.

**S. Personal injury** or **advertising injury**:

**1.** Arising out of oral or written publication of material, if done by or at the direction of the **insured** with knowledge of its falsity;

34

**2.** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy term;

**3.** Arising out of a criminal act or violation of a penal statute or ordinance committed by or at the direction of the **insured**;

**4.** For which the **insured** has assumed liability in a contract or agreement. This part of the exclusion does not apply to liability for damages that the **insured** would have in the absence of such contract or agreement; or

**5.** Committed by an insured **whose** business is:

> **a.** Advertising, broadcasting, publishing or telecasting;

> **b.** Designing or determining content of websites for others; or

> **c.** An Internet search, access, content or service provider.

> For the purpose of **5.a.** of this exclusion, the placing of frames, borders, links or advertising, for **you** or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

> However, this exclusion does not apply to **personal injury** resulting from:

>> **(1)** False arrest, detention or imprisonment;

>> **(2)** Malicious prosecution; or

>> **(3)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

***

**W. Personal injury** or **advertising injury** arising out of any **incident** first committed before the beginning of the policy term.

***

**Z. Property damage** to **your product** arising out of it or any part of it.

35

DN 7367102.3

***

**CC. Advertising injury** arising out of:

> **1.** A breach of contract, except an implied contract to use another's advertising idea in **your advertisement**.

> **2.** The failure of goods, products or services to conform with any statement or representation of quality or performance made in your **advertisement**; or

> **3.** The wrong description of the price of goods, products or services.

**DD.** **1.** Punitive or exemplary damages, except to the extent that coverage is provided in any **scheduled underlying insurance** shown in the Declarations under the Schedule of Underlying Insurance provided such coverage is maintained:

> > **a.** At the agreed liability limits shown in the Schedule of Underlying Insurance; and

> > **b.** In accordance with the **Maintenance of Underlying Insurance** condition.

> **2.** When coverage is afforded for punitive or exemplary damages under this policy:

> > **a.** Such damages are included with compensatory damages in the limits shown in the Declarations; and

> > **b.** Are not to be construed, in any event, as additional amounts of insurance.

89.    The Umbrella Policy contains, in relevant part, the following definitions:

### DEFINITIONS

To understand this policy, **you** must understand what **we** mean when **we** use these words and phrases. They appear in bold-faced print in this section and wherever used in the policy.

DN 7367102.3

**A. Advertisement** means a notice that is broadcast or published to the general public or specific market segments about **your** goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

> **1.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

> **2.** Regarding web-sites, only that part of a website that is about your goods, products or services for the purpose of attracting customers or supporters is considered an **advertisement**.

**B. Advertising injury** means injury arising out of one or more of the following offenses:

> **1.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services in **your advertisement**;

> **2.** Oral or written publication, in any manner, of material that violates a person's right of privacy in **your advertisement**;

> **3.** The use of another's advertising idea in **your advertisement**; or

> **4.** Infringing upon another's copyright, **trade dress** or slogan in **your advertisement**.

***

**E. Bodily injury** means bodily injury, bodily sickness or bodily disease sustained by a person, including death resulting from any of these at any time.

**F. Executive officer** means a person holding any of the officer positions created by **your** charter, constitution, by-laws or any other similar governing document.

***

**I. Incident** means either an occurrence or an offense, whichever is the basis of coverage, then:

> **1.** When coverage applies on an occurrence basis, **incident** means an accident with respect to:

> > **a. Bodily injury**, including damages claimed by any person or organization for care, loss of services or death resulting at anytime from the **bodily injury**; or

37

**b. Property damage**

including continuous or repeated exposure to substantially the same general harmful conditions. Continuous or repeated exposure to substantially the same general harmful conditions constitutes one **incident**.

**2.** When coverage applies on an offense basis, incident means an offense committed by the insured resulting in **personal injury** or **advertising injury**, including all such injury sustained by any one person or organization.

**J. Insured** means the person(s) or organization(s) qualifying as such under the **PERSONS AND ORGANIZATIONS INSURED** section of this policy.

**K. Insured Contract**

**1.**     **Insured contract** means:

   **a.** A contract for a lease of premises;

   **b.** A sidetrack agreement;

   **c.** An easement or license agreement in connection with vehicle or pedestrian private railroad crossings at grade;

   **d.** Any other easement agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **e.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for such municipality;

   **f.** An elevator maintenance agreement;

   **g.** That part of any contract or agreement entered into, as part of **your** business, pertaining to the rental or lease, by you or any of **your** employees, of any **automobile**; or

   **h.** That part of any other contract or agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which

38

you assume the **tort liability** of another to pay damages because of **bodily injury** or **property damage** to a third person or organization.

**2.**    An **insured contract** does not include that part of any contract or agreement:

**a.** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(1)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; or

**(2)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

**b.** Under which the **insured**, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the **insured's** rendering or failing to render professional services, including those listed in **a.** immediately above and supervisory, inspection, architectural or engineering activities.

**c.** For a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to **your** or temporarily occupied by **you** with permission of the owner;

**d.** That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**e.** For the rental, loan or lease of any **automobile** with a driver by **you** or which is rented, loaned or leased with a driver with **your** expressed permission;

**f.** That holds a person or organization engaged in the business of transporting property for hire harmless for **your** use of **your automobile** over a route or territory that

DN 7367102.3

person or organization is authorized to serve by public authority; or

**g.** That requires payment for **property damage** to any **automobile you** hire, lease or borrow or which is hired, leased or borrowed with **your** expressed permission.

**L. Personal injury** means injury, other than **bodily injury**, arising out of one or more of the following offenses:

**1.** False arrest, detention or imprisonment;

**2.** Malicious prosecution;

**3.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises, that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**4.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**5.** Oral or written publication of material, in any manner, that violates a person's right to privacy; or

**6.** Discrimination or humiliation.

**M. Policy territory** means anywhere in the world, provided that a suit on the merits is brought in the United States of America (including its territories and possessions), Puerto Rico or Canada.

**N. Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, gases and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

\*\*\*

**P. Property damage** means:

**1.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss shall be deemed to occur at the time of the physical injury that caused the loss of use.

**2.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **incident** that caused the loss of use.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

\*\*\*

**R. Scheduled underlying insurance** means the insurance policies shown in the Schedule of Underlying Insurance including any renewal or replacement of such contracts which are not more restrictive.

\*\*\*

**U. Suit** means a civil proceeding in which damages because of **bodily injury**, **property damage**, **personal injury** or **advertising injury** to which this insurance applies are alleged. **Suit** includes:

**1.** An arbitration proceeding in which such damages are claimed and to which the **insured** must submit or does submit with **our** consent; or

**2.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **insured** submits with **our** consent.

**V. Tort liability** means a liability that would be imposed by law in the absence of any contract or agreement.

\*\*\*

**Y. Ultimate net loss** means the sum actually payable by **us** to procure settlement or satisfaction of the **insured's** legal obligation for damages either by:

**1.** Final adjudication; or

**2.** Compromise with **our** written consent.

However, **ultimate net loss** shall not include salaries of the **insured's** employees or those of an **underlying insurer** or expenses incurred by the **insured**, **underlying insurer** or **us** in investigation, adjustment or litigation.

DN 7367102.3

**Z. Underlying insurance** means both **scheduled underlying insurance** and **unscheduled underlying insurance**.

**AA. Underlying insurer** means any insurer whose policy covers an **incident** also covered by this policy, but does not include insurers whose policies are excess of this insurance. It includes all insurers providing **scheduled underlying insurance** and **unscheduled underlying insurance**.

**BB. Unscheduled underlying insurance** means any insurance policies available to any **insured** (whether primary, excess, excess-contingent or otherwise) except the policies shown in the Schedule of Underlying Insurance. **Unscheduled underlying insurance** does not include any insurance which is sold as excess of this insurance.

**CC. We**, **us** and **our** means the Company providing this insurance.

**DD. You** and **your** means the person(s) or organization(s) shown as the Named **Insured** in the Declarations.

**EE. Your product** means:

> **1.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
>> **a. You**;
>>
>> **b.** Others trading under **your** name; or
>>
>> **c.** A person or organization whose business or assets **you** have acquired; and
>
> **2.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
>
> **Your product** includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of any of the items included in **1.** and **2.** immediately above.
>
> **Your product** also includes the providing of or failure to provide warnings or instructions relative to any of the items in **1.** or **2.** immediately above.
>
> **Your product** does not include vending machines or other property rented to or located for the use of others but not sold.

42

DN 7367102.3

### III.    THE CLAIM

90.    Paparazzi and the Founders requested insurance coverage for the Paparazzi Actions under the Liability Policy, EPL Endorsement and Umbrella Policy (collectively, the "Policies").

91.    The conduct and damages alleged in the Paparazzi Actions are not covered by the Policies.

92.    The Paparazzi Actions do not seek damages because of "bodily injury" or "property damage" that occurred during the applicable policy period, and which resulted from an "occurrence" or "incident"; nor do they seek damages due to "personal and advertising injury" resulting from a covered offense, which occurred during the applicable policy period.

93.    The Paparazzi Actions do not allege any "wrongful employment act" by Paparazzi against its "employees", "recognized volunteers" or applicants for employment.

94.    Moreover, the damages, injuries, conduct and relevant events alleged in the Paparazzi Actions commenced and occurred in whole or in part before the Liability Policy and Umbrella Policy incepted, and before the Retroactive Date of November 1, 2019.

95.    Exclusions in the Liability Policy, EPL Endorsement, and Umbrella Policy also apply to preclude coverage for the Paparazzi Actions.

96.    Auto-Owners nonetheless agreed to defend Paparazzi and the Founders in the Paparazzi Actions subject to a full reservation of rights, including the right to disclaim coverage, to seek a declaration in court of its rights and obligations, and to seek reimbursement of the cost of defending Paparazzi and the Founders in the Paparazzi Actions.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment - No Coverage for the Paparazzi Actions Under the Liability Policy)

97.     Auto-Owners incorporates the above paragraphs as if set forth in full.

98.     Paparazzi and the Founders claim they are entitled to insurance coverage for their defense and indemnity in the Paparazzi Actions under the Liability Policy.

99.     An actual and justiciable controversy presently exists between Auto-Owners and Paparazzi concerning whether there is coverage for Paparazzi and the Founders for the Paparazzi Actions under the Liability Policy, and the application of the Liability Policy's exclusions.

100.    A judicial determination and a declaration of the rights and obligations of the parties are necessary and appropriate at this time.

101.    The complaints in the Paparazzi Actions and the Policies are the operative documents to determine whether Auto-Owners has a duty to defend Paparazzi and the Founders in the Paparazzi Actions.

102.    Auto-Owners requests that the Court determine that Auto-Owners has no obligation under the Liability Policy to defend, indemnify, or otherwise provide coverage with respect to the Paparazzi Actions.

103.    Specifically, Auto-Owners requests a judicial determination: (i) that the Paparazzi Actions do not seek damages because of "bodily injury" or "property damage" that occurred during the policy period, and which was caused by an "occurrence," to which Coverage A of the Liability Policy applies; and (ii), even if they did, that the policy exclusions, including but not limited to those for "Expected or Intended Injury," "Contractual Liability," "Pollution" and "Damage To Your Product," bar any duty to defend or indemnify.

DN 7367102.3

104.    Auto-Owners also requests a judicial determination that (i) the Paparazzi Actions do not seek damages because of "personal injury" or "advertising injury," resulting from a covered offense which occurred during the policy period, to which Coverage B of the Liability Policy applies; and, (ii), even if they did, that the policy exclusions, including but not limited to those for "Knowing Violation of Rights of Another," "Contractual Liability," "Breach of Contract," "Quality or Performance of Goods – Failure to Conform to Statements" and "Pollution,"  bar any duty to defend or indemnify.

105.    Auto-Owners also respectfully requests that this Court make a declaration concerning its rights, duties, and obligations to Paparazzi and the Founders, if any, under the terms, provisions, limits, conditions, exclusions, and endorsements of the Liability Policy.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Judgment – No Coverage for the Paparazzi Actions Under the EPL Endorsement)**

106.    Auto-Owners incorporates the above paragraphs as if set forth in full.

107.    Paparazzi and the Founders claim they are entitled to insurance coverage for their defense and indemnity against the Paparazzi Actions under the EPL Endorsement.

108.    An actual and justiciable controversy presently exists between Auto-Owners and Paparazzi concerning whether there is coverage for Paparazzi and the Founders for the Paparazzi Actions under the EPL Endorsement, and the application of the EPL Endorsement's exclusions.

109.    A judicial determination and a declaration of the rights and obligations of the parties are necessary and appropriate at this time.

DN 7367102.3

110.     The complaints in the Paparazzi Actions and the Policies are the operative documents to determine whether Auto-Owners has a duty to defend Paparazzi and the Founders in the Paparazzi Actions.

111.     Auto-Owners requests that the Court determine that Auto-Owners has no obligation under the EPL Endorsement to defend, indemnify, or otherwise provide coverage with respect to the Paparazzi Actions.

112.     Specifically, Auto-Owners requests a judicial determination: (i) the Paparazzi Actions do not present any claim or seek damages arising out of  Paparazzi's "wrongful employment act" against its "employees," "recognized volunteers" and/or applicants for employment, which commenced or took place after the Retroactive Date of November 1, 2019, to which the EPL Endorsement applies; and (ii) that the policy exclusions, including but not limited to those for "Profit or Advantage," "Criminal Acts," "Property Damage," "Bodily Injury," "Contractual Liability" and "Prior Knowledge," bar any duty to defend or indemnify.

113.     Auto-Owners respectfully requests that this Court make a declaration concerning its rights, duties, and obligations to Paparazzi and the Founders, if any, under the terms, provisions, limits, conditions, exclusions, and endorsements of the Liability Policy, including the EPL Endorsement.

### THIRD CLAIM FOR RELIEF
### (Declaratory Judgment - No Coverage for the Paparazzi Actions Under the Umbrella Policy)

114.     Auto-Owners incorporates the above paragraphs as if set forth in full.

115.     Paparazzi and the Founders claim they are entitled to insurance coverage for their defense and indemnity in the Paparazzi Actions under the Umbrella Policy.

116.    An actual and justiciable controversy presently exists between Auto-Owners and Paparazzi concerning whether there is coverage for Paparazzi and the Founders for the Paparazzi Actions under the Umbrella Policy, and the application of the Umbrella Policy's exclusions.

117.    A judicial determination and a declaration of the rights and obligations of the parties are necessary and appropriate at this time.

118.    The complaints in the Paparazzi Actions and Policies are the operative documents to determine whether Auto-Owners has a duty to defend Paparazzi and the Founders in the Paparazzi Actions.

119.    Auto-Owners requests that the Court determine that Auto-Owners has no obligation under the Umbrella Policy to defend, indemnify, or otherwise provide coverage with respect to the Paparazzi Actions.

120.    Specifically, Auto-Owners requests a judicial determination: (i) that the Paparazzi Actions do not seek damages because of "bodily injury," "property damage," "personal injury," or "advertising injury," that took place during the policy term, and which was caused by an "incident," to which coverage under the Umbrella Policy applies; and (ii), even if they did, that the policy exclusions, including but not limited to those for "Expected or Intended Injury" (M and R.2), "Knowing Violation of Rights of Another" (R.1 and S), "Criminal Acts" (S), "Contractual Liability" (Q and S), "Breach of Contract" (CC), "Pollution" (F and J), "Damage To Your Product" (Z) and "Quality or Performance of Goods – Failure to Conform to Statements" (CC), bar any duty to defend or indemnify.

DN 7367102.3

121.     Auto-Owners also respectfully requests that this Court make a declaration concerning its rights, duties, and obligations to Paparazzi and the Founders, if any, under the terms, provisions, limits, conditions, exclusions, and endorsements of the Umbrella Policy.

### FOURTH CLAIM FOR RELIEF
### (Reimbursement)

122.     Auto-Owners incorporates the above paragraphs as if set forth in full.

123.     Paparazzi and the Founders tendered their defense in the Paparazzi Actions to Auto-Owners.

124.     Auto-Owners agreed to defend Paparazzi and the Founders in the Paparazzi Actions subject to a full reservation of its rights under the Policy and applicable law.

125.     Among the rights reserved by Auto-Owners was the right to bring an action against Paparazzi and the Founders to recover the sums paid by Auto-Owners in the defense of Paparazzi and the Founders in the Class Actions.

126.     Paparazzi and the Founders accepted the benefit of the defense provided under reservation by Auto-Owners.

127.     Pursuant to its reservation of rights, Auto-Owners has paid and continues to pay Paparazzi and the Founders costs of defense in the Paparazzi Actions.

128.     For the reasons stated above, the Policies do not provide coverage to Paparazzi or the Founders for the claims in the Paparazzi Actions.

129.     Auto-Owners is entitled to reimbursement from Paparazzi and the Founders for any and all sums spent in providing a defense to Paparazzi and the Founders in the Paparazzi Actions.

130.    Paparazzi and the Founders have been, and will continue to be, unjustly enriched if allowed to retain the benefit of the defense provided by Auto-Owners in the Paparazzi Actions even though the Policies do not provide coverage for the claims and damages asserted therein.

## PRAYER FOR RELIEF

WHEREFORE, Auto-Owners respectfully requests that the Court enter a declaratory judgment in its favor, to include the following relief:

1.    Declaring that Auto-Owners owes no obligation under the Policies to defend, indemnify, or otherwise provide coverage with respect to the following civil actions: *Tamie Hollins v. Paparazzi, LLC*, No. 2:22-cv-00553-DBB-PK (D. Utah); *Crystal Johnson et al. v. Paparazzi, LLC*, 2:22-cv-00439-DBB-PK (D. Utah); *Irene Burgess v. Paparazzi,* LLC, No. 2:22-cv-00538-DBB-PK (D. Utah); *Heather Gilbert v. Paparazzi LLC*, No. 2:22-cv-00484-DBB-PK (D. Utah); *Lori Teske and Terri Franklin v. Paparazzi, LLC, et al.*, No. 4:22-cv-00035-DBB-PK (D. Utah); and *Paparazzi, LLC dba Paparazzi Accessories, LLC v. Melissa Sorenson, et al.*, No. 4:22-cv-00028-DBB-PK (D. Utah).

2.    Declaring that Auto-Owners is entitled to reimbursement of all amounts paid to or on behalf of Paparazzi and the Founders related to the Paparazzi Actions, including all amounts incurred in defending the Paparazzi Actions against Paparazzi and the Founders and in bringing this action, and entering an award in favor of Auto-Owners in that amount;

3.    Awarding costs, attorney fees, and pre-judgment and post-judgment interest as permitted by law; and

4.    Entering a judgment for such other and further relief as the Court deems just and proper under the circumstances.

DN 7367102.3

Dated: the <u>6th</u> day of April, 2023

                       LEWIS | HANSEN

                       <u>/s/ Mark D. Taylor</u>
                       Mark D. Taylor
                       *Attorneys for Auto-Owners Insurance Company*

DN 7367102.3