Mark D. Taylor (A9533)
**LEWIS | HANSEN**
The Judge Building, Suite 410
Eight East Broadway
Salt Lake City, Utah 84111-2239
Telephone:  (801) 746-6300
Facsimile:  (801) 746-6301
mtaylor@lewishansen.com

William M. Brophy
**Spencer Fane LLP**
1700 Lincoln Street, Suite 2000
Denver, CO  80203-4554
Telephone:  303.839.3800
Facsimile:  303.839.3838
wbrophy@spencerfane.com

*Attorneys for Plaintiff Auto-Owners Insurance Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AUTO-OWNERS INSURANCE COMPANY, a Michigan corporation<br><br>Plaintiff,<br><br>v.<br><br>PAPARAZZI, LLC, a Utah limited liability company; MISTY KIRBY, an individual; TRENT KIRBY, an individual; CHANTEL REEVE, an individual; and RYAN REEVE, an individual.<br><br>Defendants. | **PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 4:23-cv-00027-AMA-PK<br><br>Judge Ann Marie McIff Allen |

Plaintiff Auto-Owners Insurance Company ("Auto-Owners") seeks a judicial declaration

that it owes no obligation under its Tailored Protection Policy ("Liability Policy") and

Commercial Umbrella Policy ("Umbrella Policy") (collectively, the "Policies") to defend or

indemnify Paparazzi, LLC ("Paparazzi"), Misty Kirby, Trent Kirby, Chantel Reeve and Ryan Reeve ("Founders") with respect to the putative class action complaints and counterclaims against them related to Paparazzi products ("Underlying Actions").

Each of the claims asserted against Paparazzi in the Underlying Actions are predicated on the allegation that Paparazzi advertised its products as "lead and nickel free," even though Paparazzi's products do in fact contain those metals. The Policies do not afford coverage for the claims for several reasons. First, the Underlying Actions do not seek damages because of "bodily injury" or "property damage" which resulted from an "occurrence" or "incident"; nor do they seek damages due to "personal and advertising injury" resulting from a covered offense. Likewise, the Underlying Actions do not allege any "wrongful employment act" by Paparazzi against its "employees", "recognized volunteers" or applicants for employment. Moreover, the damages, injuries, conduct, and relevant events alleged in the Underlying Actions commenced and occurred in whole or in part before the Policies incepted, and before the Retroactive Date of November 1, 2019. And, finally, exclusions in the Policies nonetheless apply to preclude coverage for the Underlying Actions.

## MOVANT'S STATEMENT OF MATERIAL FACTS ("FACTS")

**I.      CLAIMS IN THE UNDERLYING ACTIONS**

1.      Beginning in April 2022, alleged consumers, purchasers, and consultants of Paparazzi products commenced legal actions, including the filing of putative class action

complaints and counterclaims, against Paparazzi, as well as the Founders, related to Paparazzi's products ("Underlying Actions").

2.     The Underlying Actions include: *Tamie Hollins v. Paparazzi, LLC*, ("*Hollins* Action") (Complaint, App'x, Ex. 1); *Crystal Johnson et al. v. Paparazzi, LLC*, ("*Johnson* Action") (Complaint, App'x, Ex. 2); *Irene Burgess v. Paparazzi, LLC*, ("*Burgess* Action") (Complaint, App'x, Ex. 3); *Heather Gilbert v. Paparazzi LLC*, ("*Gilbert* Action") (Complaint, App'x, Ex. 4); *Lori Teske and Terri Franklin v. Paparazzi, LLC, et al.*, ("*Teske* Action") (Complaint, App'x, Ex. 5); and claims filed by Geraldine Souza and Jennifer Carrol in the arbitration proceeding titled *Geraldine Souza and Jennifer Carrol. v. Paparazzi, LLC dba Paparazzi Accessories, LLC, et al.* ("*Souza* Arbitration") (Second Amended Statement of Claims, App'x, Ex. 6).

3.     The *Hollins* Action, *Johnson* Action, *Burgess* Action, and *Gilbert* Action were consolidated together, along with claims by other claimants, into an action titled *Carnelius Anderson, et al. v. Paparazzi, LLC,* Case No. 2:22-cv-00439-DBB-PK ("Consolidated Action") in the United States District Court for the District of Utah. (First Consolidated Amended Class Action Complaint and Jury Demand in the Consolidated Action, App'x, Ex. 7.)

**A.     The Consolidated Action**

4.     The Consolidated Action alleges that Paparazzi is a multi-level marketing business that sells jewelry and other accessories wholesale in bulk to consultants. (App'x, Ex. 7 ¶ 3.)

5.      The Consolidated Action alleges that, while Paparazzi represented and expressly warranted that its products are "lead-free and nickel-free," it designed, sourced, and sold jewelry containing detective levels of lead, nickel, and other heavy metals. (*Id.* ¶ 2.)

6.      The Consolidated Action alleges that Paparazzi promoted its products as "lead-free and nickel-free" on its website as recently as November 9, 2021, but has since removed such representations on or about December 2021 or early 2022. (*Id.* ¶¶ 47, 51.)

7.      The Consolidated Action alleges that nickel and lead may pose health problems to consumers of products containing such metals. (*See id.* ¶¶ 80-84.)

8.      The Consolidated Action alleges that Paparazzi "profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers." (*Id.*, ¶ 243; *see also* ¶ 178.) It further alleges that Paparazzi's "false statements, misrepresentations and material omissions about the presence of lead and nickel contained in its Products were intentionally made and were specifically designed to induce consumers to purchase its Products." (*Id.* ¶ 10.) It alleges that Paparazzi "intentionally and knowingly misrepresented and failed to disclose material facts." (*Id.* ¶ 10, 229.) It alleges that Paparazzi "has actual knowledge that its Products contain lead and nickel"; "had actual knowledge that the marketing, packaging, and labeling of the Products was deceptive and misleading because the Products undergo regular testing for all heavy metals including lead, nickel, and cadmium"; and that Paparazzi "was aware of the deception in its marketing, advertising, and sale of the Products, given the inclusion of lead and nickel in its Products." (*Id.* at ¶¶ 107-109; *see also* ¶¶ 111-112, 126.)

9. The Consolidated Action alleges that the plaintiffs purchased Paparazzi products for personal purposes at various times between 2013 and 2022, based on the products being advertised as lead and nickel free. (*Id.* ¶¶ 13-34.)

10. The Consolidated Action alleges that each of the plaintiffs suffered economic damages related to the purchase of the Paparazzi products. (*Id.*)

11. The Consolidated Action alleges that plaintiffs Judy Baird, Nancy Campbell, Cassandra Cave, Lucille Clark, Jeri Covington, Jacqueline Huskey, Deanna Jackson, Catoyya Morgan, Patricia Powell, Nelisha Rodriguez, and Denise Smiley also experienced various reactions to the lead and nickel in the Paparazzi products. (*Id.* ¶¶ 14, 16-19, 23, 24, 29, 30, 31, 33.)

12. The Consolidated Action alleges as the "injury" under the Fed. R. Civ. P. 9(b) allegations, that "Plaintiffs and proposed Class Members did not receive the benefit of their bargain. They purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent [Paparazzi's] misrepresentations, false statements and/or omissions." (*Id.* ¶ 128, subparagraph g.)

13. The Consolidated Action defines its nationwide class as "[a]ll persons who purchased Paparazzi Products in the United Stated within the Relevant Time Period." (*Id.* ¶ 130.) The Consolidated Action also seeks certification of State Classes. (*Id.* ¶¶ 131-145.)

14. The Consolidated Action asserts claims for: (i) negligent misrepresentation, (ii) fraudulent misrepresentation, (iii) unjust enrichment, (iv) breach of express warranty, (v) breach of implied warranty, (vi) violation of the Alabama Deceptive Trade Practices Act, (vii) violation of California Consumer Legal Remedies Act, (viii) violations of California Unfair Competition

Law, (ix) violations of California False Advertising Law, (x) violations of Florida Deceptive and

Unfair Trade Practices Act, (xi) violation of the Georgia Fair Business Practices Act, (xii)

violation of the Georgia Uniform Deceptive Trade Practices Act, (xiii) violation of Illinois

Consumer Fraud and Deceptive Business Practices Act, (xiv) violation of Illinois Deceptive

Trade Practices Act, (xv) violations of Kansas Consumer Protection Act, (xvi) violations of

Kentucky Consumer Protection Act, (xvii) violation of the Michigan Consumer Protection Act,

(xviii) violations of the Missouri Merchandising Practices Act, (xix) violations of the New Jersey

Consumer Fraud Act, (xx) violations of False Advertising Under New York Law, (xxi)

violations of unfair and deceptive trade practices under New York Law, (xxii) violations of

North Carolina Unfair and Deceptive Trade Practices Act, (xxiii) violations of the Virginia

Consumer Protection Act, (xxiv) violations of the Washington Consumer Protection Act. (*Id.* ¶¶

158-463.)

### B.   The *Teske* Action

15.     The *Teske* Action alleges that Paparazzi is a "multilevel-marketing company that

used a nationwide network of sellers, or 'Consultants,' to peddle low-budget jewelry and

accessory items laces with high levels of toxic contaminant, first to its national network of

sellers, who were then saddles with huge amounts of unsellable and dangerous products."

(App'x, Ex. 5 ¶ 1.)

16.     The *Teske* Action alleges that Paparazzi "falsely represented to its sellers … that

its jewelry and accessories were 'lead and nickel free' and were in compliance with state rules

limiting the amount of dangerous toxins in consumer products." (*Id.*) The complaint alleges that

Paparazzi's jewelry "contains astonishingly high levels of lead, nickel, cadmium, and/or other

toxic metals." (*Id.*) It further alleges that some of the products tested for high levels of mercury and arsenic as well. (*Id.* ¶ 47.)

17.    *Teske* alleges that Paparazzi directly advertised that all of its products are "Lead-free and nickel-free" beginning on October 18, 2018, if not earlier. (*Id.* ¶ 39.)

18.    Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve (the "Founders") are alleged to be Paparazzi co-founders and are also named as defendants in the *Teske* Action. (*Id.* ¶¶ 25-28.)

19.    The *Teske* Action alleges that Paparazzi and the Founders "knew of the . . . false representations of quality and ongoing sale of Paparazzi's products with dangerous levels of lead and nickel." (*Id.*; *see also id.* ¶ 101.)

20.    The *Teske* Action alleges that Paparazzi's conduct was "deliberate, willful, and intentional." (*Id.* Prayer For Relief.)

21.    The *Teske* Action alleges that the plaintiffs have suffered "irreparable injury," (*id.* ¶ 80) and suffered "economic and reputational damages." (*Id.* ¶ 68.)

22.    According to the complaint, Lori Teske signed up to be a "consultant" on October 24, 2020 and purchased products through November 2021. (*Id.* ¶¶ 13-17.) Terri Franklin signed up to be a consultant on June 30, 2019, and purchased and sold jewelry until October 2021. (*Id.* ¶¶ 18-20.)

23.    The *Teske* Action defines its nationwide class as "[a]ll Paparazzi Consultants who sold Paparazzi accessories from the beginning of any applicable statute of limitations period until December 16, 2021." (*Id.* ¶ 65.)

24.     The complaint in the *Teske* Action contains no allegation that plaintiffs or the Paparazzi "consultants" are or were employees of Paparazzi.

25.     The *Teske* Action asserts claims for: (i) violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)), (ii) breach of implied warranty (Utah Code § 70A-2314), (iii) breach of contract, and (iv) breach of covenant of good faith and fair dealing.

### C.     The *Souza* Arbitration

26.     Geraldine Souza and Jennifer Carrol asserted a second amended statement of claims against Paparazzi and the Founders in an arbitration proceeding titled *Geraldine Souza and Jennifer Carrol. v. Paparazzi, LLC dba Paparazzi Accessories, LLC, et al*. (App'x, Ex. 6.)

27.     The statement of claims in the *Souza* Arbitration alleges that Paparazzi is a multi-level marketing company that sells jewelry and accessories, and relies on a network of salespeople, known as "consultants," to do so. (*Id.* ¶¶ 6.)

28.     The statement of claims alleges that, since 2017, Paparazzi directly advertised to consumers and consultants that its jewelry and accessories were "lead-free and nickel-free." (*Id.* ¶¶ 9-12, 85.)

29.     The statement of claims alleges that Paparazzi's representations were false, and that Paparazzi products contained unsafe levels of known toxins, including lead, nickel, cadmium, arsenic, and mercury. (*Id.*, ¶¶ 25-29, 49, 87.) It further claims that wearing jewelry and accessories containing these toxins can cause adverse health effects. (*Id.* ¶ 37-42.)

30.     The statement of claims alleges that "Paparazzi induced Claimants and other innocent third parties to purchase its products, based, in part, on its representations hat the products are safe and otherwise free from harmful materials such as lead and nickel." (*Id.* ¶ 43.)

31.     The statement of claims alleges that the Founders "knew of Paparazzi's false representations, knew that Paparazzi's jewelry and accessories contained toxic metals, including lead and nickel, and disregarded those dangers to unjustly enrich Paparazzi and its Founders at the expense and safety of consumers such as Claimants." (*Id.* ¶¶ 44-47.)

32.     The statement of claims alleges that, based on Paparazzi's representations, Souza, a former "Consultant" of Paparazzi, purchased at least $1,808,930 worth of jewelry and accessories from Paparazzi," (*id.* ¶¶ 13, 17), and that Carrol, a former "Consultant" of Paparazzi, "purchased at least $5,922 worth of jewelry and accessories from Paparazzi." (*Id.* ¶ 19, 22.).

33.     The statement of claims alleges that the claimants "have been and continue to be injured, including commercially, by Paparazzi's false or misleading representations through the diversion of sales, reputational harm, and loss of goodwill." (*Id.* ¶ 55.) It further alleges that Paparazzi knew that its representations of fact were false or misleading. (*Id.* ¶¶ 57, 88, 109.)

34.     The statement of claims alleges that Carrol suffered a loss of money as a result of Paparazzi's false and misleading statements. (*Id.* ¶ 76.). It further alleges that Souza was deprived of approximately $1.8 million based on Paparazzi's false statements. (*Id.* ¶ 82.)

35.     The statement of claims alleges that Paparazzi's "Lead-Laden Jewelry" caused Souza pain and suffering. (*Id.* ¶¶ 125, 132.)

36.     The statement of claims in the *Souza* Arbitration includes claims for: (i) violation of Lanham Act, (ii) violation of Utah's Truth in Advertising Act, (iii) violation of Utah Consumer's Sale Practices Act, (iv) violation of Idaho Statute 48-608, (v) violation of California Code § 17500, (vi) intentional misrepresentation, (vii) negligent misrepresentation, (viii) violation of Racketeer Influenced and Corrupt Organizations Act, (ix) strict products liability –

design defect, (x) strict products liability – manufacturing defect, (xi) strict products liability –

failure to warn, and (xii) negligence. (*Id.* ¶¶ 48-145.)

## II.  THE LIABILITY POLICY

37.  Auto-Owners issued the "Liability Policy", policy number 57590888, to named

insured Paparazzi. (App'x, Ex. 8.)

38.  The Liability Policy was in effect from November 1, 2021 to November 1, 2022.

(*Id.*)

39.  The Liability Policy's insuring agreement provision for coverage for bodily injury

and property damage (Coverage A) states, in relevant part:

> **a.** We will pay those sums that the insured becomes legally obligated to
> pay as damages because of "bodily injury" or "property damage" to which
> this insurance applies. We will have the right and duty to defend the
> insured against any "suit" seeking those damages. We may at our
> discretion investigate any claim or "occurrence" and settle any claim or
> "suit" that may result. But:
>
> > **(1)** The amount we will pay for damages is limited as described in
> > Section **III** - Limits of Insurance; and
> >
> > **(2)** Our right and duty to defend end when we have used up the
> > applicable limit of insurance in the payment of judgments or
> > settlements under Coverage **A** or **B** or medical expenses under
> > Coverage **C**.
> >
> > No other obligation or liability to pay sums or perform acts or
> > services is covered unless explicitly provided for under
> > Supplementary Payments - Coverages **A** and **B**.
>
> **b.** This insurance applies to "bodily injury" and "property damage" only
> if:
>
> > **(1)** The "bodily injury" or "property damage" is caused by an
> > "occurrence" that takes place in the "coverage territory";

Case 4:23-cv-00027-AMA-PK   Document 34   Filed 05/16/24   PageID.804   Page 11 of 42

(**2**) The "bodily injury" or "property damage" occurs during the policy period; and

(**3**) Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

(*Id.*, Auto-Owners_000174)

40.    The Liability Policy contains the following exclusions applicable to Coverage A:

**2. Exclusions**

This insurance does not apply to:

**a.   Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(**1**) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. However, if the insurance under this policy does not apply to the liability of the insured, it also does not apply to such liability assumed by the insured under an "insured contract".

**(2)** That the insured would have in the absence of the contract or agreement.

***

### f. Pollution

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

> **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. . . .

> **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

> **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

> > **(i)** Any insured; or

> > **(ii)** Any person or organization for whom you may be legally responsible; or

> **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

> > **(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

12

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or . . .

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

### k. Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

(*Id.*, Auto-Owners_000175-177.)

41.     The Liability Policy's insuring agreement provision for coverage for

personal and advertising injury (Coverage B) states, in relevant part:

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(**2**) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

(*Id.*, Auto-Owners_000178.)

42.     The Liability Policy contains the following exclusions applicable to Coverage B:

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another** "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

\*\*\*

**e. Contractual Liability** "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract** "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements** "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

\*\*\*

14

**m. Pollution** "Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related** Any loss, cost or expense arising out of any:

> **(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

> **(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

(*Id.*, Auto-Owners_000178-179.)

43.     The Liability Policy contains the following definitions which are applicable to

Coverage A and Coverage B:

> **1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

> > **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

> > **b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

***

> **3.** "Bodily injury" means bodily injury, bodily sickness or bodily disease sustained by a person, including death resulting from any of these at any time.

***

> **13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

15

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

>   **a.** False arrest, detention or imprisonment;

>   **b.** Malicious prosecution;

>   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

>   **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

>   **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

>   **f.** The use of another's advertising idea in your "advertisement"; or

>   **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement"

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

***

**17.** "Property damage" means:

>   **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

>   **b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

>   For the purposes of this insurance, electronic data is not tangible property.

***

16

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

> **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

> **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

***

**21.** "Your product":

> **a.** Means:

>> **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

>>> **(a)** You;

>>> **(b)** Others trading under your name; or

>>> **(c)** A person or organization whose business or assets you have acquired; and

>> **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

> **b.** Includes:

>> **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

>> **(2)** The providing of or failure to provide warnings or instructions.

> **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

(*Id.*, Auto-Owners_000184-187.)

      **a.   EPL Endorsement**

44.     The Liability Policy also contains an employment practices liability coverage endorsement ("EPL Endorsement"). (*Id.*, Auto-Owners_000162-170.)

45.     The EPL Coverage Period was from November 1, 2021 to November 1, 2022, and has a Retroactive Date of November 1, 2019. (*Id.*, Auto-Owners_000022.)

46.     Based on the information provided to Auto-Owners, the Declarations page acknowledges that Paparazzi has 316 full-time employees and 0 part-time employees. (*Id.*)

47.     The EPL Endorsement contains, in relevant part, the following insuring agreement:

> **1.**  We shall pay those "losses" arising out of an insured's "wrongful employment act" against your "employees", "recognized volunteers" and "applicant for employment to which this insurance applies. The "wrongful employment acts" must commence or take place after the Retroactive Date shown on the Declarations, but before the end of the "EPL coverage period". . . A "claim" or "suit" for a "wrongful employment act" must be first made against you during the "EPL coverage period" or any Extended Reporting Period (if applicable) and reported pursuant to the terms of this EPL Coverage Endorsement.

(*Id.*, Auto-Owners_000162.)

48.     The following exclusions apply to coverage under the EPL Endorsement:

> This insurance does not apply to:

> **C.  "Property Damage"**

> Any "property damage".

> **D.  "Bodily Injury"**

> Any "bodily injury".

> Except that this exclusion does not apply to any "claim" for emotional distress arising out of "wrongful employment acts"…

\*\*\*

### F. Contractual Liability

Any liability arising out of any actual or alleged contractual liability of any insured under any express contract or agreement. This exclusion shall not apply to any liability the insured would have in the absence of such express contract or agreement.

\*\*\*

### J. Prior Knowledge

Any liability arising out of incidents, circumstances or "wrongful employment acts", to which an insured:

**1.** Had knowledge of; or

**2.** Could have reasonably foreseen might result in a "claim" or "suit"

and which were known to the insured prior to the effective date of this EPL Coverage or the EPL Coverage issued by us for which this EPL Coverage is an uninterrupted renewal.

(*Id.*, Auto-Owners_000163-164.)

49.     Section IV. Limit of Liability of the EPL Endorsement states the following:

**D.** All "claims" and "suits" arising from the same or "related wrongful employment acts" shall be treated as arising out of a single "wrongful employment act".

**E.** All "claims" or "suits" arising out of one "wrongful employment act" shall be deemed to be made on the date that the first such "claim" is made or "suit" is brought. All "claims" asserted in a "class action suit" will be treated as arising out of a single "wrongful employment act".

(*Id.*, Auto-Owners_000165.)

50.     The EPL Endorsement contains the following applicable definitions:

**A.** "Bodily injury" means physical injury, sickness, or disease sustained by a person, including death resulting from any of these at any time.

**B.** "Claim" means a written demand for money. The term "claim" shall also mean an Equal Employment Opportunity Commission (EEOC), Department of Labor (DOL) or Office of Federal Contract Compliance Program (OFCCP) (or similar federal, state or local agency) proceeding or investigation commenced by the filing of a notice of

charges, service of a complaint or similar document of which notice has been given to you. In no event, shall the term "claim" include any labor or grievance proceeding, which is subject to a collective bargaining agreement.

\*\*\*

**F.**  "Employee" means an individual whose labor or service is engaged by and directed by you for remuneration, whether such individual is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary "employees". "Employee" also means any independent contractor or a "leased worker" who is treated under applicable law as an "employee" of the Company, which shall be determined at the time of the "wrongful employment act".

\*\*\*

**I.**  "Loss(es)" means monetary damages to which this insurance applies and which you are legally obligated to pay (including front pay and back pay), judgments, settlements, pre- and post-judgment interest on that part of any judgment paid by us, statutory attorney fees, and "defense costs", however, "loss" shall not include:

**1.**  Civil or criminal fines or penalties imposed by law;

**2.**  Taxes;

**3.**  Employment related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation;

**4.**  Any liability or costs incurred by any insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar; or

**5.**  Matters which may be deemed uninsurable under the law pursuant to which this EPL Coverage shall be construed.

Where permitted by law, "loss" shall include punitive or exemplary damages imposed upon any insured (subject to the terms, conditions and exclusions of this EPL Coverage Endorsement)

\*\*\*

**K.**  "Property damage" means physical injury to, or destruction of, tangible property including the loss of use thereof, or loss of use of tangible property, which has not been physically injured or destroyed.

\*\*\*

**M.**  "Related wrongful employment acts" means "wrongful employment acts" which are the same, related or continuous, or "wrongful employment acts" which arise from a common nucleus of facts. "Claims" or "suits" can allege "related wrongful

20

employment acts", regardless of whether such "claims" or "suits" involve the same or different claimants, insureds or legal causes of actions.

***

**Q.**   "Wrongful employment act" means any actual or alleged:

**1.**   Wrongful dismissal, discharge or termination (either actual or constructive), including breach of an implied contract;

**2.**   Harassment (including sexual harassment, whether quid pro quo, hostile work environment or otherwise);

**3.**   Discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy of disability);

**4.**   "Retaliation" (including lockouts);

**5.**   Employment-related misrepresentation(s) to your "employee", "recognized volunteer" or applicant for employment with you;

**6.**   Employment-related:

    **a.**   Libel, slander or defamation;

    **b.**   Humiliation;

    **c.**   Mental anguish;

    **d.**   Invasion of privacy; or

    **e.**   Intentional infliction of emotional distress;

**7.**   Wrongful failure to employ or promote;

**8.**   Wrongful deprivation of career opportunity, wrongful demotion or negligent "employee" evaluation, including the giving of negative or defamatory statements in connection with an "employee" reference;

**9.**   Wrongful discipline;

**10.**   Failure to provide or enforce adequate or consistent policies and procedures relating to any "wrongful employment act";

**11.**   Negligent supervision or hiring by an insured, relating to any of the above; or

**12.**   Violation of an individual's civil rights relating to **1.** through **11.** above.

(*Id.*, Auto-Owners_000169_170.)

### a. The Umbrella Policy

51.     Auto-Owners issued the Umbrella Policy, policy number 52-572263-01, to named

insured Paparazzi. (App'x, Ex. 9.)

52.     The Umbrella Policy was in effect from November 1, 2021 to November 1, 2022.

(*Id.*, Auto-Owners_000212.)

53.     The Umbrella Policy's insuring agreement states as follows in relevant part:

> **We** agree to provide insurance relying on the statements in the Declarations and
> subject to all the terms and conditions of this policy. In return, **you** must pay the
> premium and comply with all policy terms and conditions.
>
> ***
>
> **A. We** will pay those sums included in **ultimate net loss** that the insured becomes
> legally obligated to pay as damages because of:
>
> > **1. Bodily injury**;
> >
> > **2. Property damage**;
> >
> > **3. Personal injury**; or
> >
> > **4. Advertising injury**
>
> to which this insurance applies caused by an **incident**.
>
> **B.** If the basis of coverage for an **incident** is:
>
> > **1.** An occurrence:
> >
> > > **a.** The **bodily injury** and **property damage** must take place
> > > during the policy term; and
> > >
> > > **b.** The **incident** must take place in the **policy territory**; and
> >
> > ***
> >
> > **2.** An offense:

22

> **a.** The **personal injury** and **advertising injury** must be committed during the policy term; and
>
> **b.** The **incident** must take place in the **policy territory**.

(*Id.*, Auto-Owners_000217, 221-222.)

54.   The Umbrella Policy contains, in relevant part, the following exclusions:

This policy does not apply to:

***

**F.**   **1. Bodily injury** arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of , or ingestion of, asbestos or asbestos related particles, dust, irritants, contaminants, **pollutants**, toxic elements or materials.

**2. Property damage** arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, asbestos or asbestos related particles, dust, irritants, contaminants, **pollutants**, toxic elements or materials.

**3. Personal injury** or **advertising injury** arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of , ingestion of, contact with, exposure to, existence of, or presence of, asbestos or asbestos related particles, dust, irritants, contaminants, **pollutants**, toxic elements or materials.

**4.** Any loss, cost or expense arising, in whole or in part, out of abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, asbestos or asbestos related particles, dust, irritants, contaminants, **pollutants**, toxic elements or materials, by any insured or any other person or entity.

(*Id.,* Auto-Owners_000245.)

***

**J.**   **1. Bodily injury**, **property damage**, **personal injury** or **advertising injury** arising out of the actual, alleged or threatened discharge, dispersal, release, escape, seepage or migration of **pollutants**.

**2.** Any loss, cost or expense arising out of any:

23

> **a.** Request, demand, order or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess, the effects of **pollutants**; or

(*Id.*, Auto-Owners_000249.)

***

**M. Bodily injury** or **property damage** expected or intended from the standpoint of the **insured**. This exclusion does not apply to **bodily injury** resulting from the use of reasonable force to protect persons or property.

***

**Q. Bodily injury** or **property damage** for which the **insured** is obligated to pay damages by reason of assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

> **1.** Assumed in a contract or agreement that is an **insured contract**, provided such **bodily injury** or **property damage** occurs subsequent to the execution of the contract or agreement. However, if the insurance under this policy does not apply to the liability of the **insured**, it also does not apply to such liability assumed by the **insured** under and **insured contract**; or

> **2.** That the **insured** would have in the absence of the contract or agreement.

**R. Personal injury** or **advertising injury**:

> **1.** Caused by or at the direction of any **insured** with the knowledge that the act would violate the rights of another and would inflict **personal injury** or **advertising injury**; or

> **2.** Expected or intended by any **insured**. This exclusion R.2., does not apply to **personal injury**.

**S. Personal injury** or **advertising injury**:

> **1.** Arising out of oral or written publication of material, if done by or at the direction of the **insured** with knowledge of its falsity;

24

**2.** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy term;

**3.** Arising out of a criminal act or violation of a penal statute or ordinance committed by or at the direction of the **insured**;

**4.** For which the **insured** has assumed liability in a contract or agreement. This part of the exclusion does not apply to liability for damages that the **insured** would have in the absence of such contract or agreement; or

\*\*\*

However, this exclusion does not apply to **personal injury** resulting from:

> **(1)** False arrest, detention or imprisonment;
>
> **(2)** Malicious prosecution; or
>
> **(3)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

\*\*\*

**W. Personal injury** or **advertising injury** arising out of any **incident** first committed before the beginning of the policy term.

\*\*\*

**Z. Property damage** to **your product** arising out of it or any part of it.

\*\*\*

**CC. Advertising injury** arising out of:

**1.** A breach of contract, except an implied contract to use another's advertising idea in **your advertisement**.

**2.** The failure of goods, products or services to conform with any statement or representation of quality or performance made in your **advertisement**; or

**3.** The wrong description of the price of goods, products or services.

**DD.**   **1.** Punitive or exemplary damages, except to the extent that coverage is provided in any **scheduled underlying insurance** shown in the Declarations under the Schedule of Underlying Insurance provided such coverage is maintained:

> **a.** At the agreed liability limits shown in the Schedule of Underlying Insurance; and

> **b.** In accordance with the **Maintenance of Underlying Insurance** condition.

**2.** When coverage is afforded for punitive or exemplary damages under this policy:

> **a.** Such damages are included with compensatory damages in the limits shown in the Declarations; and

> **b.** Are not to be construed, in any event, as additional amounts of insurance.

(*Id.*, Auto-Owners_000223-230.)

55.     The Umbrella Policy contains, in relevant part, the following definitions:

**A. Advertisement** means a notice that is broadcast or published to the general public or specific market segments about **your** goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:
1.

**1.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**2.** Regarding web-sites, only that part of a website that is about your goods, products or services for the purpose of attracting customers or supporters is considered an **advertisement**.

**B. Advertising injury** means injury arising out of one or more of the following offenses:

**1.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services in **your advertisement**;

26

**2.** Oral or written publication, in any manner, of material that violates a person's right of privacy in **your advertisement**;

**3.** The use of another's advertising idea in **your advertisement**; or

**4.** Infringing upon another's copyright, **trade dress** or slogan in **your advertisement**.

***

**E. Bodily injury** means bodily injury, bodily sickness or bodily disease sustained by a person, including death resulting from any of these at any time.

***

**I. Incident** means either an occurrence or an offense, whichever is the basis of coverage, then:

**1.** When coverage applies on an occurrence basis, **incident** means an accident with respect to:

**a. Bodily injury**, including damages claimed by any person or organization for care, loss of services or death resulting at anytime from the **bodily injury**; or

**b. Property damage**

including continuous or repeated exposure to substantially the same general harmful conditions. Continuous or repeated exposure to substantially the same general harmful conditions constitutes one **incident**.

**2.** When coverage applies on an offense basis, incident means an offense committed by the insured resulting in **personal injury** or **advertising injury**, including all such injury sustained by any one person or organization.

**J. Insured** means the person(s) or organization(s) qualifying as such under the **PERSONS AND ORGANIZATIONS INSURED** section of this policy.

***

**L. Personal injury** means injury, other than **bodily injury**, arising out of one or more of the following offenses:

**1.** False arrest, detention or imprisonment;

**2.** Malicious prosecution;

27

**3.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises, that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**4.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**5.** Oral or written publication of material, in any manner, that violates a person's right to privacy; or

**6.** Discrimination or humiliation.

\*\*\*

**N. Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, gases and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

\*\*\*

**P. Property damage** means:

**1.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss shall be deemed to occur at the time of the physical injury that caused the loss of use.

**2.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **incident** that caused the loss of use.

For the purposes of this insurance, electronic data is not tangible property.

\*\*\*

**U. Suit** means a civil proceeding in which damages because of **bodily injury**, **property damage**, **personal injury** or **advertising injury** to which this insurance applies are alleged. **Suit** includes:

**1.** An arbitration proceeding in which such damages are claimed and to which the **insured** must submit or does submit with **our** consent; or

**2.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **insured** submits with **our** consent.

28

**V. Tort liability** means a liability that would be imposed by law in the absence of any contract or agreement.

***

**EE. Your product** means:

> **1.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
> > **a. You**;
> >
> > **b.** Others trading under **your** name; or
> >
> > **c.** A person or organization whose business or assets **you** have acquired; and
>
> **2.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
>
> **Your product** includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of any of the items included in **1.** and **2.** immediately above.
>
> **Your product** also includes the providing of or failure to provide warnings or instructions relative to any of the items in **1.** or **2.** immediately above.
>
> **Your product** does not include vending machines or other property rented to or located for the use of others but not sold.

(*Id.*, Auto-Owners_217-221.)

## III.   PAPARAZZI'S CLAIM FOR INSURANCE COVERAGE

56.     Paparazzi and the Founders requested insurance coverage for the Underlying Actions under the Liability Policy, EPL Endorsement and Umbrella Policy (collectively, the "Policies").

57.     Auto-Owners agreed to provide a defense subject to a full reservation of rights, including the right to disclaim coverage, to seek a declaration in court of its rights and obligations, and to seek reimbursement of the cost of defending Paparazzi and the Founders in the Underlying Actions. (*See* Reservation of Rights Letters, App'x, Ex. 10.)

**ARGUMENT**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the issue could be resolved in favor of either party. *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. *Id.* Here, the material facts are undisputed, and Auto-Owners' motion presents pure questions of law that are appropriate for resolution by summary judgment.

## I.   AUTO-OWNERS OWES NO DUTY TO DEFEND UNDER THE TERMS AND EXCLUSIONS OF THE POLICIES

"The existence of a duty to defend against a particular claim is a question of law." *Apartment Inv. & Mgmt. Co. v. Nutmeg Ins. Co.*, 593 F.3d 1188, 1193 (10th Cir. 2010). To determine whether an insurer owes a duty to defend, Utah courts ordinarily apply the "eight[-]corners rule" by "comparing the allegations within the four corners of the complaint [for which defense is sought] to the language contained in the four corners of the insurance policy." *Headwaters Res., Inc. v. Ill. Union Ins. Co.*, 770 F.3d 885, 891 (10th Cir. 2014); *Fire Ins. Exch. v. Estate of Therkelsen*, 2001 UT 48, ¶ 21, 27 P.3d 555 ("An insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations in the complaint."); *see also Hartford Cas. Ins. v. Softwaremedia.com*, 2:10-CV-01098 BSJ, 2012 WL 965089, at *10 (D. Utah Mar. 20, 2012) (granting insurer summary judgment where the terms of the policy expressly exclude coverage for the underlying allegations). Under Utah law, "the duty to defend 'is triggered when the allegations in the underlying complaint[,] if proved, could result in liability under the policy.'" *Headwaters Res., Inc.,* 770 F.3d at 891.  To avoid the duty to

defend, the insurer must show that "none of the allegations of the underlying claim[s] is

potentially covered [under the relevant insurance policy] (or that a policy exclusion conclusively

applies to exclude all potential for such coverage)." *Id.*

Under Utah law, the court must interpret the insurance policy as it would any written

contract, under general contract interpretation principles. *Benjamin v. Amica Mut. Ins. Co.*, 140

P.3d 1210, 1213 (Utah 2006). "If the language within the four corners of the contract is

unambiguous, the parties' intentions are determined from the plain meaning of the contractual

language, and the contract may be interpreted as a matter of law." *Green River Canal Co. v.

Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134; *Saleh v. Farmers Ins. Exchange*, 133 P.3d 428, 434

(Utah 2006); *Basic Research, LLC v. Admiral Ins. Co.*, 297 P.3d 578, 580 (Utah 2013) ("When

interpreting a contract, a court looks within the four corners of the contract to determine the

parties' intentions, which are controlling.") (internal quotations omitted). "Where the language of

the policy is clear and unambiguous, the agreement should be enforced as written." *Farm Bureau

Prop. & Cas. Ins. Co. v. Sparks*, 619 F. Supp. 3d 1104, 1113 (D. Utah 2022).

Auto-Owners owes no duty to defend because the Underlying Actions do not fall within

the scope of coverage under the Policies. And, even if they did, multiple exclusions in the

Policies unambiguously bar coverage.

### A.     Liability Policy

#### 1.     Coverage A – Bodily Injury and Property Damage Liability

Under Coverage A of the Liability Policy, Auto-Owners has a duty to defend Paparazzi

against lawsuits seeking damages because of "bodily injury" or "property damage." But such

duty is triggered, subject to other terms and exclusions in the Liability Policy, only if, *inter alia*,

the "bodily injury" or "property damage": (1) is caused by an "occurrence"—i.e., "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"; and (2) occurs during the policy period. Applying the four corners of the Underlying Actions to the four corners of the Liability Policy, Auto-Owners owes no duty to defend under Coverage A for several reasons.

First, claimants in the Consolidated Action and *Teske* Action do not seek damages from Paparazzi because of "bodily injury" or "property damage" that occurred during the policy period. Rather, such claimants seek damages based on allegations that the products sold and advertised by Paparazzi—since at least 2013—were not what they were represented to be. (*See* Facts, ¶¶ 4-25.) There are no allegations that Paparazzi caused damage to any claimants' property in any of the actions, nor are there any allegations of bodily injury in the *Teske* Action. And while certain claimants in the Consolidated Action allege to have suffered adverse reactions to the Paparazzi products, they do not seek any damages for alleged bodily injury under any of the asserted claims. (Facts, ¶¶ 12-14.)

Notwithstanding, any alleged "bodily injury" or "property damage" was not caused by an "occurrence." That is, any damage allegedly sustained by claimants in the Underlying Actions was not caused by "an accident". Although the Liability Policy does not separately define "accident", the Utah Supreme Court has construed that term in the insurance context as being "descriptive of means which produce effects which are not their natural and probable consequences." *N.M. ex rel. Caleb v. Daniel E.*, 175 P.3d 566, 569 (Utah 2008) (quoting *Richards v. Standard Accident Ins. Co.*, 200 P. 1017, 1023 (Utah 1921)). Thus, "harm or damage is not accidental if it is the natural and probable consequence of the insured's act or should have

been expected by the insured." *Id.* "Th[is] generally presents a legal question as to what the average individual would expect to happen under the circumstances." *Id.* at 569-570. And the Court must "look to whether the injury, rather than the act giving rise to the injury, is accidental." *Id.* at 571.

Here, to the extent that there is any allegation of "property damage" or "bodily injury," such "property damage" or "bodily injury" is a "natural and probable consequence" of Paparazzi's products containing allegedly toxic metals and Paparazzi failing to disclose same to its consumers. In other words, any harm or damage alleged in the Underlying Actions was not accidental. *See id.* Thus, the Underlying Actions do not contain allegations of an "occurrence" necessary to trigger coverage under Coverage A. *See Owners Ins. Co. v. Greenhalgh Planning & Dev., Inc.*, 22-4008, 2023 WL 4994512, at *3 (10th Cir. Aug. 4, 2023) (finding the alleged property damage was not caused by an occurrence because it was the natural and expected consequence of the failure to ensure that a barn complied with applicable building code); *Green v. State Farm Fire & Cas. Co.*, 127 P.3d 1279, 1284 (Utah Ct. App. 2005) (failure to disclose risk of landslide, whether intentional or negligent, was not an "occurrence" within the meaning of the policy); *Nova Cas. Co. v. Able Const., Inc.*, 983 P.2d 575, 581 (Utah 1999) (holding that negligent misrepresentation is not an "occurrence" or an "accident" under a commercial general liability policy); *H.E. Davis & Sons, Inc. v. N. Pac. Ins. Co.*, 248 F. Supp. 2d 1079, 1084 (D. Utah 2002) (finding there was no "occurrence" where consequences of inadequacy were natural and foreseeable).

## 2.    Coverage B – Personal and Advertising Injury

For similar reasons, Auto-Owners also does not owe any duty to defend under Coverage B – Personal and Advertising Injury because the Underlying Actions do not allege any "personal and advertising injury," as that term is defined in the Liability Policy. (Facts, ¶ 55.) That term refers to a series of defined offenses, including false arrest, detention or imprisonment; malicious prosecution; wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; oral or written publication, in any manner, of material that violates a person's right of privacy; the use of another's advertising idea in your "advertisement"; or infringing upon another's copyright, trade dress or slogan in your "advertisement." (*Id.*) The allegations of the Underlying Actions do not consist of any of these offenses. *See Basic Research, LLC*, 297 P.3d at 580-82 (holding that claims related to false advertising, defective product, and failure to perform as advertised were not covered under coverage for personal and advertising injury).

### 3.    Exclusions

Moreover, even if the Underlying Actions alleged "bodily injury" or "property damage" caused by an "occurrence" or "personal and advertising injury", multiple exclusions would nonetheless apply to bar coverage. First, each of the Underlying Actions allege facts that bring them within the exclusion for "Expected Or Intended Injury." This exclusion bars coverage for bodily injury or property damage expected or intended from Paparazzi's standpoint. (Facts, ¶ 40.)  The Underlying Actions allege that Paparazzi made material misrepresentations about its products, knew the representations to be false during the relevant time period but made them

anyways, and actively concealed same. (Facts, ¶¶ 8, 19-20, 31.) Thus, based on the allegations, the claimed damages were expected and/or intended from Paparazzi's standpoint, and the exclusion applies. For similar reasons, even if "personal and advertising injury" was alleged, the "Knowing Violation Of Rights Of Another" exclusion would apply. (Facts, ¶ 42.)

Next, to the extent the claimants allege that the products they purchased from Paparazzi are damaged, such injury or damage comes within the "damage to your product" exclusion. (Facts, ¶ 40.) Similarly, the "Quality Or Performance Of Goods—Failure To Conform To Statements" exclusion also applies to the extent any "personal and advertising injury" is alleged. (Facts, ¶ 42.) This exclusion bars coverage for personal and advertising injury arising out of the failure of goods, products, or services to conform with any statement of quality or performance made in an advertisement. (*Id.*) The Underlying Actions allege pervasive misrepresentations regarding lead-free and nickel-free products in Paparazzi's marketing and advertising. These alleged misrepresentations consist of statements of quality regarding Paparazzi's jewelry or other products. Thus, those advertisements, on which the Underlying Actions depend, fall within this exclusion, even if it were the case that they trigger Coverage B and are not barred from coverage for other reasons. *See Basic Research, LLC,* 297 P.3d at 582 (finding quality or performance of goods exclusion applied where the underlying claims are premised on the insured's failure to perform as advertised).

Further, the warranty and contract-based claims in the Underlying Actions also come within the policy's contractual liability exclusions. (Facts, ¶¶ 40, 42.) These exclusions, which apply to both Coverage A and Coverage B, state expressly that bodily injury, property damage,

and personal and advertising injury for which Paparazzi is obligated to pay damages by reason of the assumption of liability in a contract or agreement is barred. (*Id.*)

Finally, the pollution exclusions also apply, given the Underlying Actions' allegations regarding nickel, lead, or other allegedly toxic materials in Paparazzi products. (*Id.*) The Liability Policy's definition of a "pollutant," encompasses any solid that is a contaminant and that meets the other requirements of the exclusion. Thus, the nickel, lead, and other allegedly toxic materials would constitute a "pollutant" and any alleged harm or injury resulting from same would be excluded from coverage.

### B.    EPL Endorsement

Paparazzi has also tendered defense and indemnity to Auto-Owners under the EPL Endorsement of the Liability Policy. However, as with Coverages A and B, the EPL Endorsement does not provide coverage for the underlying claims. The Underlying Actions do not allege any "wrongful employment act" by Paparazzi (or its Founders) against its "employees", "recognized volunteers" or applicants for employment.

First, there is no allegation that Paparazzi committed any "wrongful employment act", as that term is defined in the policy. "Wrongful employment act" refers to a series of defined offenses that do not encompass the allegations in the Underlying Actions. (Facts, ¶ 50.) While the Underlying Actions allege that Paparazzi made certain misrepresentations related to its products, there is no allegation that such misrepresentation(s) were employment-related. (*See generally* App'x, Exs. 1-7.) Rather, the misrepresentations were made in its marketing materials to consumers of its products. (*Id.,* Facts, ¶¶ 5, 6, 17, 28.)

Additionally, the claimants in the Underlying Actions are not "employees", "recognized volunteers" or applicants for employment. In the Consolidated Action, it is alleged that the plaintiffs and class members are consumers or customers who purchased Paparazzi's products. (Facts, ¶¶ 9, 13.) In the *Teske* suit and *Souza* Arbitration, it is alleged that plaintiffs are independent "consultants"; i.e., individuals who participated in Paparazzi's multi-level marketing scheme by purchasing and re-selling Paparazzi products. (Facts, ¶ 23, 32.) There is no allegation that any of the plaintiffs are "employees" (or otherwise treated under applicable law as "employees"), "recognized volunteers" or applicants for employment with Paparazzi.

Moreover, coverage under the EPL Endorsement is barred because, even if there were allegations of "wrongful employment acts", such acts took place before the Retroactive Date of November 1, 2019. Pursuant to the Insuring Agreement, "the 'wrongful employment acts' must commence or take place after the Retroactive Date" for coverage to apply. (Facts, ¶ 47.) The EPL Endorsement also states, "[a]ll 'claims' and 'suits' arising from the same or 'related wrongful employment acts' shall be treated as arising out of a single 'wrongful employment act'." (Facts, ¶ 49.) The Underlying Actions are each predicated on alleged misrepresentations and/or other wrongful acts which are the same, related, continuous, or which arise from a common nucleus of facts. (Facts ¶¶ 4-36.) Therefore, even if the Underlying Actions alleged any "wrongful employment act" committed by Paparazzi against its "employees", each suit is treated as arising out of a single "wrongful employment act". (*See* Facts, ¶¶ 49-50.) The purported misrepresentations and wrongful acts are alleged to have begun at least as early as 2013. (*See* Facts, ¶ 9.) Thus, to the extent such alleged misconduct constitutes a "wrongful employment

act", it occurred *before* the Retroactive Date of November 1, 2019. Accordingly, no coverage under the EPL Endorsement applies.

Finally, even if the Underlying Actions alleged "wrongful employment acts" which were not barred from coverage for other reasons, several exclusions nonetheless apply. Each suit contains allegations claiming that Paparazzi made material misrepresentations, knew the representations to be false but made them anyway, and actively concealed such misrepresentations. Such allegations bring the Underlying Actions within the exclusion for "Prior Knowledge," which bars coverage for incidents, circumstances or "wrongful employment" acts which Paparazzi had knowledge of or could have reasonably foreseen might result in a "claim" or "suit" and which were known to Paparazzi prior to the effective date of the EPL Coverage. (Facts, ¶ 48.) The "bodily injury" exclusion would apply to any claim seeking damages for such "bodily injury". (*Id.*) And, for the same reasons stated above, (*supra* § I.A.3.), the warranty- and contract-based claims also come within the contractual liability exclusion. (*Id.*)

### C.     Umbrella Policy

The Umbrella Policy provides no coverage for the allegations in the Underlying Actions for many of the same reasons that the Liability Policy does not provide coverage. Like the Liability Policy, the Umbrella Policy does not provide any coverage because the Underlying Actions do not allege any "bodily injury" or "property damage" caused by an "occurrence". (*See supra* § I.A.1., Facts, ¶ 53) The Underlying Actions also do not allege any "personal injury" or "advertising injury", as those terms are defined in the Umbrella Policy. (*See supra* § I.A.2.; Facts, ¶ 55.)

Moreover, even if the Underlying Actions came within the realm of coverage for "bodily injury", "property damage" or "personal and advertising injury," exclusions nonetheless apply for the reasons articulated above, including the exclusions for expected or intended injury, knowing violation of rights of another, contractual liability, pollution, damage to your product, and quality or performance of goods—failure to conform to statements. (*Supra* § I.A.3., Facts, ¶ 54.)

## II.      AUTO-OWNERS HAS NO DUTY TO INDEMNIFY AS A MATTER OF LAW

"[B]ecause in Utah the duty to defend is broader than the duty to indemnify, 'there cannot be a duty to indemnify' if there is not duty to defend." *Greenhalgh Planning & Dev., Inc.*, 2023 WL 4994512, at *5 (quoting *Banner Bank v. First Am. Title Ins. Co*., 916 F.3d 1323, 1328 (10th Cir. 2019)); *Owners Ins. Co. v. CJC Foundations, Inc*., 683 F. Supp. 3d 1275, 1287-1288 (D. Utah 2023); *Derma Pen, LLC v. Sentinel Ins. Co., Ltd*., 545 F. Supp. 3d 1177, 1202 (D. Utah 2021). Because Auto-Owners owes no duty to defend Paparazzi or the Founders under the Policies, it also owes no duty to indemnify them under those Policies. (*See supra* Argument § I.)

## III.     PAPARAZZI'S COUNTERCLAIMS FAIL AS A MATTER OF LAW

For the reasons set forth above, each of Paparazzi's counterclaims fail as a matter of law and must be dismissed. Because there is no coverage for the Underlying Actions, Paparazzi is not entitled to the declaratory relief it requests (First Counterclaim), nor can it prevail on its breach of contract claim (Second Counterclaim). Likewise, Paparazzi cannot prevail on its counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing for alleged wrongful denial of policy benefits (Third Counterclaim).

Under the implied covenant of good faith and fair dealing, "the contracting parties each impliedly promise not to 'intentionally or purposely do anything [that] will destroy or injure the other party's right to receive the fruits of the contract.'" *Prince v. Bear River Mut. Ins. Co*., 56 P.3d 524, 533 (Utah 2002) (quoting *Brown v. Moore*, 973 P.2d 950, 954 (Utah 1998)). To date, Auto-Owners has provided Paparazzi a defense in the Underlying Actions. (App'x, Ex. 9.) Notwithstanding, even if Auto-Owners denied benefits, such denial was reasonable. "[D]enial of a claim is reasonable if the insured's claim is fairly debatable." *Prince*, 56 P.3d at 533. This is because "if an insurer denies an 'insured's claim [that] is fairly debatable, [then] the insurer is entitled to debate it and cannot be held to have breached the implied covenant [of good faith and fair dealing] if it chooses to do so.'" *Id*. at 533-534 (quoting *Morris v. Health Net of Cal., Inc*., 1999 UT 95, ¶ 7, 988 P.2d 940). Auto-Owners commenced this action to resolve the coverage dispute between the parties. And, as set forth herein, Auto-Owners established that it owes no duty to defend or indemnify Paparazzi in the Underlying Actions. Thus, Auto-Owners cannot have breached the covenant of good faith and fair dealing by failing to pay benefits that were not owed (or, at a minimum, fairly debatable). *See Colony Ins. Co. v. Human Ensemble, LLC*, 299 P.3d 1149, 1155 (Utah Ct. App. 2013); *Fire Ins. Exch. v. Oltmanns*, 370 P.3d 566, 569 (Utah Ct. App. 2016).

## <u>CONCLUSION</u>

For the reasons set forth above, Auto-Owners respectfully requests that the Court grant summary judgment on Auto-Owners' declaratory judgment claims, enter the relief requested in its First Amended Complaint, and dismiss Paparazzi's Counterclaims.

Dated: May 16, 2024                              Respectfully submitted,


                                                 *s/William M. Brophy*
                                                 William M. Brophy
                                                 Spencer Fane LLP
                                                 1700 Lincoln Street, Suite 2000
                                                 Denver, CO  80203-4554
                                                 Telephone:  303.839.3800
                                                 Facsimile:  303.839.3838
                                                 Email:    wbrophy@spencerfane.com

                                                 Mark D. Taylor (A9533)
                                                 LEWIS | HANSEN
                                                 The Judge Building, Suite 410
                                                 Eight East Broadway
                                                 Salt Lake City, Utah 84111-2239
                                                 Telephone:  (801) 746-6300
                                                 Facsimile:  (801) 746-6301
                                                 mtaylor@lewishansen.com

                                                 Attorneys for Plaintiff
                                                 Auto-Owners Insurance Company


**I, William M. Brophy, certify that this document contains 10584 words and complies with**

**DUCivR 7-1(a)(4).**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2024, I caused a true and correct copy of the foregoing to be served via the court's CM/ECF system to all counsel of record.

_/s/William M. Brophy_____