UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **AUTO-OWNERS INSURANCE,** | **MEMORANDUM DECISION & ORDER GRANTING IN PART, DENYING IN PART, & DISMISSING WITHOUT PREJUDICE IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT & DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| **PAPARAZZI, et al,** | Civil No. 4:23-cv-00027-AMA-PK |
| Defendants. | District Judge Ann Marie McIff Allen |
| | Magistrate Judge Paul Kohler |

This matter comes before the Court on the (1) Motion for Summary Judgment filed by Plaintiff/Counter Defendant Auto-Owner's Insurance ("AOI")[1] and the (2) Motion for Partial Summary Judgment filed by Defendants/Counter Claimants Paparazzi, LLC ("Paparazzi"), Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve (collectively, the "Paparazzi Parties").[2] The Court did not hear oral argument. For the reasons below, the Court will grant in part, deny in part, and dismiss without prejudice in part Plaintiff's Motion. The Court will also grant in part, deny in part, and dismiss without prejudice in part Defendants' Motion.

---

[1] ECF No. 54, filed June 3, 2025.
[2] ECF No. 56, filed June 3, 2025.

1

**UNDISPUTED FACTS[3]**

Plaintiff AOI issued a liability insurance policy numbered 57590888 ("the Liability

Policy") to named insured Paparazzi.[4] The Liability Policy was in effect from November 1,

2021, to November 2, 2022.[5] The Liability Policy's Commercial General Liability Coverage

Form ("CGL Policy") for Bodily Injury and Property Damage Liability ("Coverage A") provides

in relevant part as follows:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages
> because of "bodily injury" or "property damage" to which this insurance
> applies. We will have the right and duty to defend the insured against any "suit" seeking
> those damages. However, we will have no duty to defend the insured against any "suit"
> seeking damages for "bodily injury" or "property damage" to which this insurance does
> not apply. We may, at our discretion, investigate any claim or "occurrence" and settle any
> claim or "suit" that may result. . . .
> b. This insurance applies to "bodily injury" and "property damage" only if:
>     (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes
>         place in the "coverage territory";
>     (2) The "bodily injury" or "property damage" occurs during the policy period . . .[6]

The CGL Policy defines "suit" as "a civil proceeding in which damages because of 'bodily

injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies

are alleged[,]" including "[a]n arbitration proceeding in which such damages are claimed and to

which the insured must submit or does submit with our consent[.]"[7] "Bodily injury" is defined as

"bodily injury, sickness or disease sustained by a person, including death resulting from any of

these at any time."[8] "'Occurrence' means an accident, including continuous or repeated exposure

---

[3] The Court includes in this background section only undisputed facts material to the instant
decision.
[4] ECF No. 55, Ex 10. The parties do not appear to dispute that Misty Kirby, Trent Kirby, Chantel
Reeve, and Ryan Reeve, who AOI refers to as the "Founders," ECF No. 54 at 2, would be
insured under the Liability Policy.
[5] ECF No. 55, Ex. 10 at Auto-Owners_000011.
[6] *Id*. at Auto-Owners_000174.
[7] *Id*. at Auto-Owners_000187.
[8] *Id*. at Auto-Owners_000184.

to substantially the same general harmful conditions."[9]

The Liability Policy also contains an Employment Practices Liability Coverage

Endorsement ("EPL Endorsement").[10] The EPL coverage period was from November 1, 2021 to

November 1, 2022 with a Retroactive Date of November 1, 2019.[11] The EPL Endorsement reads

in relevant part as follows:

> **A. Insuring Agreement**
> 1. We shall pay those "losses" arising out of an insured's "wrongful employment act"
> against your "employees," "recognized volunteers" and applicants for employment to
> which this insurance applies. The "wrongful employment acts" must commence or take
> place after the Retroactive Date shown on the Declarations, but before the end of the
> "EPL coverage period." . . . A "claim" or "suit" for a "wrongful employment act" must
> be first made against you during the "EPL coverage period" or any Extended Reporting
> Period (if applicable) and reported pursuant to the terms of this EPL Coverage
> Endorsement.
> . . .
> **B. Defense**
> 1. We have the right and duty to defend and appoint an attorney to defend any "claim" or
> "suit" brought against any insured for a "wrongful employment act" to which this
> insurance applies, even if the "claim" or "suit" is groundless or fraudulent.[12]

The EPL Endorsement defines "suit" as "a civil proceeding or an administrative proceeding

seeking money damages, and includes an arbitration, mediation or any other alternative dispute

resolution procedure seeking such damages, to which the insured must submit or may submit

with our consent."[13] "'Employee' means an individual whose labor or service is engaged by and

directed by you for remuneration, whether such individual is in a supervisory, co-worker or

subordinate position or otherwise, including any part-time, seasonal and temporary

'employees[.]'"[14] "'Employee' also means any independent contractor or a 'leased worker' who

---

[9] *Id*. at Auto-Owners_000186.
[10] *Id*. at Auto-Owners_000162–70.
[11] *Id*. at Auto-Owners_000022.
[12] *Id*. at Auto-Owners_000162.
[13] *Id*. at Auto-Owners_000170.
[14] *Id*. at Auto-Owners_000169.

is treated under applicable law as an 'employee' of the Company, which shall be determined at

the time of the 'wrongful employment act[.]'"[15] "Wrongful employment act" is defined as

follows:

> Q. "Wrongful employment act" means any actual or alleged:
> 1. Wrongful dismissal, discharge or termination (either actual or constructive), including breach of implied contract;
> 2. Harassment (including sexual harassment, whether quid pro quo, hostile work environment or otherwise);
> 3. Discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);
> 4. "Retaliation" (including lockouts);
> 5. Employment-related misrepresentation(s) to your "employee", "recognized volunteer" or applicant for employment with you;
> 6. Employment-related:
>    a. Libel, slander or defamation;
>    b. Humiliation;
>    c. Mental anguish;
>    d. Invasion of privacy; or
>    e. Intentional infliction of emotional distress;
> 7. Wrongful failure to employ or promote;
> 8. Wrongful deprivation of career opportunity; wrongful demotion or negligent "employee" evaluation, including the giving of negative or defamatory statements in connection with an "employee" reference;
> 9. Wrongful discipline;
> 10. Failure to provide or enforce adequate or consistent policies and procedures relating to any "wrongful employment act";
> 11. Negligent supervision or hiring by an insured, relating to any of the above; or
> 12. Violation of an individual's civil rights relating to **1.** through **11.** above.[16]

In addition to the Liability Policy, AOI issued an Umbrella Policy numbered 52-572263-

01 (the "Umbrella Policy") to named insured Paparazzi.[17] The Umbrella Policy was in effect

from November 1, 2021, to November 1, 2022.[18] The Umbrella Policy provides in relevant part

as follows:

---

[15] *Id*.
[16] *Id*. at Auto-Owners_000170.
[17] *See id*. Ex. 11.
[18] *Id*. at Auto-Owners_000212.

> **A. We** will pay those sums included in **ultimate net loss** that the **insured** becomes legally obligated to pay as damages because of:
> **1. Bodily injury;**
> **2. Property damage;**
> **3. Personal injury; or**
> **4. Advertising injury**
> to which this insurance applies caused by an **incident**.
> **B.** If the basis of coverage for an **incident** is:
> 1. An occurrence:
>> a. The **bodily injury** and **property damage** must take place during the policy term; and
>> b. The **incident** must take place in the **policy territory** . . . [19]

Under the Umbrella Policy,

> **[i]ncident** means either an occurrence or an offense, whichever is the basis of coverage, then:
>> 1. [w]hen coverage applies on an occurrent basis, **incident** means an accident with respect to:
>>> a. **[b]odily injury**, including damages claimed by any person or organization for care, loss of services or death, resulting at anytime from the **bodily injury**; or
>>> b. **[p]roperty damage**[.] [20]

"Bodily injury" is defined as "bodily injury, bodily sickness or bodily disease sustained by a person, including death resulting from any of these at any time."[21]

Beginning in April 2022, alleged consumers, purchasers, and consultants of Paparazzi products commenced legal actions, including the filing of putative class action complaints and counterclaims, against Paparazzi, as well as against Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve. Several of the actions were consolidated together, along with claims by other claimants, into an action titled *Johnson et al. v. Paparazzi, LLC*, No. 2:22-cv-00439-AMA-PK ("Consolidated Action") in the United States District Court for the District of Utah. Also at issue here is the action titled *Teske et al v. Paparazzi, LLC, et al*, No. 4:22-cv-00035-DN-PK ("*Teske*

---

[19] *Id*. at Auto-Owners_000221–222 (emphasis in original).
[20] *Id*. at Auto-Owners_000218 (emphasis in original).
[21] *Id*. at Auto-Owners_000217.

Action")[22] and the arbitration proceeding titled *Souza et al v. Paparazzi, LLC dba Paparazzi Accessories, LLC et al* ("*Souza* Arbitration").[23] The Consolidated Action, the *Teske* Action, and the *Souza* Arbitration will be referred to collectively as the "Underlying Actions."

**Consolidated Action**

Pursuant to a motion to dismiss, the majority of the claims alleged in the Second Amended Class Action Complaint were dismissed without prejudice on March 27, 2026.[24] The Court in the Consolidated Action ordered the plaintiffs to file a Third Amended Class Action Complaint within thirty days of the Court's order.[25]

***Teske* Action**

In the *Teske* Action, the putative Class Action Complaint ("*Teske* Complaint") alleges that Paparazzi "used a nationwide network of sellers, or 'Consultants,' to peddle low-budget jewelry and accessory items laced with high levels of toxic contaminants, first to its national network of sellers, who were then saddled with huge amounts of unsellable and dangerous products."[26] According to the *Teske* Complaint, as recently as November 2021, Paparazzi advertised its products to Consultants and consumers as being lead- and nickel-free and as being compliant with California's Proposition 65, which "requires disclosures if certain levels of numerous toxic substances—including lead, nickel, and cadmium—meet or exceed a threshold amount, depending on the substance."[27] However, allegedly, laboratory testing confirmed that

---

[22] *See* ECF No. 55, Ex. 5; ECF No. 4, Ex. 5.

[23] *See* ECF No. 55, Ex 6.

[24] *Johnson et al v. Paparazzi LLC*, No. 2:22-cv-00439-AMA-PK, ECF No. 117 (D. Utah Mar. 27, 2026). "[A] court may . . . take judicial notice, whether requested or not . . . of its own records and files[.]" *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979).

[25] *Johnson et al v. Paparazzi LLC*, No. 2:22-cv-00439-AMA-PK, ECF No. 117.

[26] ECF No. 55, Ex. 5 ¶ 1.

[27] *Id.* ¶ 4.

"Paparazzi's products are not lead-free, nickel-free, or otherwise free of Toxic Metals"—the products often contain "shockingly high and potentially toxic[] levels of lead, nickel, and other toxic metals like cadmium that are hazardous to human health."[28] The *Teske* Complaint alleges that Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve "knew" of the false representations and ongoing sale of Paparazzi's products with dangerous levels of lead and nickel but "disregarded" those dangers.[29]

It is further alleged that the U.S. Department of Health and Human Services ("HHS"), Centers for Disease Control ("CDC"), National Institute for Occupational Safety and Health ("NIOSH"), and Agency for Toxic Substances and Disease Registry ("ATSDR") "all agree" that "lead is exceedingly dangerous. Even if a person is exposed for only a short period of time, and even through only skin contact, a person may experience abdominal pain, constipation, headaches, irritability, loss of appetite, memory loss, pain or tingling in the hands and/or feet, and general weakness."[30] Additionally, "[l]ead is particularly dangerous because when a person is exposed to lead, it is absorbed by the human body and stored in human tissue[.]"[31] As for nickel, according to the *Teske* Complaint, the "HHS, CDC, NIOSH, and ATSDR agree that nickel is a known human toxin" that can enter the bloodstream through skin contact, which can cause chronic bronchitis, reduced lung function, and cancer of the lung and nasal sinus.[32] The "HHS, CDC, NIOSH, and ATSDR" also identify cadmium as a toxin, and it is classified by the

---

[28] *Id.* ¶ 5.
[29] *Id.* ¶¶ 24–28.
[30] *Id.* ¶ 41.
[31] *Id.* ¶ 42.
[32] *Id.* ¶ 44.

HHS as a known carcinogen.[33] "Common injuries for cadmium exposure include kidney and lung damage."[34]

The plaintiffs in the *Teske* Action are Lori Teske and Terri Franklin, two Paparazzi Consultants who allegedly spent thousands of dollars on Paparazzi jewelry that they came to consider unsellable due to the jewelry being a health hazard.[35] Ms. Teske alleges that she "began to have suspicions that the jewelry was not safe when, after purchasing Paparazzi jewelry, she began experiencing headaches and vertigo for the first time in her life."[36] The plaintiffs brought suit against the Paparazzi Parties for various claims including Violation of Lanham Act § 43(a), Breach of Implied Warranty, Breach of Contract, and Breach of the Covenant of Good Faith and Fair Dealing.[37] In the Prayer for Relief, the plaintiffs request, in relevant part, "an award of funds sufficient to carry out a national corrective advertising campaign to mitigate the reputational harm Defendants' wrongful conduct has caused";[38] an award "in the amount of the difference between the (worthless) value of lead- and nickel-containing Paparazzi accessories and the market price of the product that [p]laintiffs . . . actually paid for:" lead- and nickel-free costume jewelry as advertised;[39] and awards for "the lost profit value to plaintiffs . . . that they would have earned had they sold each of the accessory pieces that [d]efendants sold to them."[40]

---

[33] *Id.* ¶ 45.
[34] *Id.*
[35] *Id.* ¶¶ 13–23.
[36] *Id.* ¶ 15.
[37] *Id.* ¶¶ 69–121.
[38] *Id.* at 32 ¶ E.
[39] *Id.* at 32 ¶ H.
[40] *Id.* at 32 ¶¶ J–K.

In October of 2023, the *Teske* Action was, pursuant to a Stipulation of Dismissal,[41]
dismissed with prejudice.[42]

**Souza Arbitration**

In the *Souza* Arbitration, the Second Amended Statement of Claims[43] (the "*Souza*
Statement of Claims*") alleges that Paparazzi "used a network of sellers, known as 'Consultants,'
to peddle low-budget jewelry and accessory items laced with toxic contaminants."[44] "For more
than four years, Paparazzi represented to its Consultants and the general public that all of
Paparazzi's jewelry and accessories were 'lead and nickel free' and that its products complied
with applicable laws and rules limiting the amount of dangerous toxins in consumer products."[45]
However, allegedly, "independent laboratory testing has confirmed that Paparazzi's
representations were false. Not only did the products contain lead and nickel—often in amounts
that exceed applicable safety thresholds—they contained other heavy and dangerous metals,
including cadmium, mercury, and arsenic."[46]

According to the *Souza* Statement of Claims, "[l]ead is a known human carcinogen
capable of being absorbed in the human body and stored in human tissue, bones, and blood."[47]
"Even a brief exposure to lead through skin contact can result in abdominal pain, constipation,
headaches, hyperirritability, loss of appetite, memory loss, pain or tingling in the hands or feet,

[41] *Teske et al v. Paparazzi, LLC, et al*, 4:25-cv-00035-DN-PK, ECF No. 83 (D. Utah Oct. 10, 2023).
[42] *Id*. ECF No. 84 (D. Utah Oct. 11, 2023).
[43] The parties dispute precisely when the Second Amended Statement of Claims was filed, but the exact date of filing is immaterial here. The parties do not dispute that it serves as the operative pleading in the *Souza* Arbitration.
[44] ECF No. 55, Ex. 6 ¶ 6.
[45] *Id*. ¶ 7.
[46] *Id*. ¶ 8.
[47] *Id*. ¶ 37.

general weakness, seizures, coma, or even death."[48] Similarly, nickel has "been classified as a human carcinogen[,]" and "[n]ickel exposure can result in chronic bronchitis, reduced lung function, and kidney damage."[49]

The *Souza* Statement of Claims alleges that Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve "knew of Paparazzi's false representations[;] knew that Paparazzi's jewelry and accessories contained toxic metals, including lead and nickel[;] and disregarded those dangers[.]"[50] It further alleges that the Paparazzi Parties "knew, or in the exercise of reasonable due care, should have known of the manufacturing and/or design defects of the Lead-Laden Jewelry and that it was likely to be dangerous for the use for which it was intended[]"[51] and that the Paparazzi Parties "knew, or in the exercise of reasonable care, should have known that the Lead-Laden Jewelry was unfit for the purposes for which it was used."[52]

The claimants in the *Souza* Arbitration are Geraldine Souza and Jennifer Carrol, two Paparazzi Consultants who allegedly spent substantial amounts of money on Paparazzi jewelry that they would not have purchased or resold but for Paparazzi's representations.[53] Upon learning of the misrepresentations, the claimants were left with many pieces of jewelry that they could not sell or sold at a significant discount.[54] The claims in the *Souza* Arbitration brought against the Paparazzi Parties include Violation of the Lanham Act, Violation of Utah's Truth in Advertising Act, Violation of the Utah Consumer Sales Practices Act, Violation of Idaho Statute 48-608, Violation of California Code § 17500, Intentional Misrepresentation, Negligent

---

[48] *Id.* ¶ 38.
[49] *Id.* ¶¶ 41–42.
[50] *Id.* ¶¶ 44–47.
[51] *Id.* ¶ 141.
[52] *Id.* ¶ 142.
[53] *Id.* ¶¶ 13–23.
[54] *Id.* ¶¶ 18, 23.

Misrepresentation, Violation of the Racketeer Influenced and Corrupt Organizations Act, Design Defect Products Liability, Manufacturing Defect Products Liability, Failure to Warn Products Liability, and Negligence.[55] In relation to these claims, the claimants allege that they were "injured, including commercially, by Paparazzi's false or misleading representations through the diversion of sales, reputational harm, and loss of goodwill[,]"[56] and Ms. Carrol alleges that she "suffered a loss of money as a result of Paparazzi's false and misleading statements."[57] Ms. Souza alleges that the design and manufacturing defects in the "Lead-Laden Jewelry" were "proximate cause[s] of [her] Symptoms and further caused [her] extreme pain and suffering."[58]

On December 31, 2024, the *Souza* Arbitration was dismissed with prejudice.[59]

**Paparazzi's Claim for Insurance Coverage**

The Paparazzi Parties requested insurance coverage for the Underlying Actions under the CGL Policy, the EPL Endorsement, and the Umbrella Policy (collectively, the "Policies").[60] AOI agreed to provide a defense subject to a full reservation of rights, including the right to disclaim coverage, the right to seek a declaration in court of its rights and obligations, and the right to seek reimbursement of defense costs.[61]

AOI initiated this action seeking declaratory judgment of its duties under the Policies with respect to the Underlying Actions on April 6, 2023.[62] AOI filed the instant Motion for Summary Judgment on June 3, 2025.[63] The Paparazzi Parties filed their response on July 1,

---

[55] *Id*. ¶¶ 48–145.
[56] *Id*. ¶ 55.
[57] *Id*. ¶ 76.
[58] *Id*. ¶¶ 125, 132.
[59] ECF No. 56, Ex. H.
[60] ECF No. 4 ¶ 90.
[61] ECF No. 55, Ex. 12 at Auto-Owners _000316.
[62] ECF No. 2.
[63] ECF Nos. 54–55.

2025,[64] to which AOI replied on July 29, 2025.[65] The Paparazzi Parties then filed Objections to Evidence in Plaintiff's Reply on August 5, 2025,[66] and AOI filed a response to the Objections on August 12, 2025.[67]

The Paparazzi Parties filed their Motion for Partial Summary Judgment on June 3, 2025.[68] AOI filed its Opposition on July 1, 2025,[69] and the Paparazzi Parties filed their Reply on July 29, 2025.[70]

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[71] "A fact is 'material' if, under the governing law, it could influence the outcome of the lawsuit."[72] "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmovant on the evidence presented."[73] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[74]

---

[64] ECF No. 61.
[65] ECF Nos. 64–65.
[66] ECF No. 67.
[67] ECF No. 68.
[68] ECF No. 56.
[69] ECF No. 60.
[70] ECF No. 66.
[71] Fed. R. Civ. P. 56(a).
[72] *Mauldin v. Driscoll*, 136 F.4th 984, 993 (10th Cir. 2025) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[73] *Id*.
[74] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

**DISCUSSION**

Under Utah law,[75] "[a]n insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts."[76] Thus, Utah courts interpret insurance policies as they would any other contract—"to give effect to the intent of the parties as expressed by the plain language of the instrument itself."[77] "If the policy language is clear and unambiguous, the court must construe it according to its plain and ordinary meaning"[78] and "may not rewrite an insurance contract for the parties if the language is clear and unambiguous."[79] "Ambiguities are construed against the drafter—the insurance company—and in favor of coverage."[80]

The issues in the present matter concern whether AOI had a duty to defend the Paparazzi Parties in the Underlying Actions. A duty to defend arises "when the insurer ascertains facts giving rise to potential liability under the insurance policy."[81] It is a broad duty, broader than an insurer's duty to indemnify such that "an insurer may have a duty to defend an insured even if . . . the insurer is ultimately not liable to indemnify the insured."[82] In determining whether an insurer owes a duty to defend, Utah courts generally apply the "eight-corners rule" by "comparing the allegations within the four corners of the complaint to the language contained in

---

[75] The parties do not dispute that Utah law governs the issues in this case. *See Celtig, LLC v. Patey*, 489 F. Supp. 3d 1275, 1282 (D. Utah 2020) (applying Utah law where the parties did not dispute that Utah law "govern[ed] the interpretation of the Agreement").

[76] *Alf v. State Farm Fire & Cas.*, 850 P.2d 1272, 1274 (Utah 1993).

[77] *Headwaters Res., Inc. v. Ill. Union Co.*, 770 F.3d 885, 891 (10th Cir. 2014) (citing *Alf*, 850 P.2d at 1275).

[78] *Allegis Inv. Servs., LLC v. Arthur J. Gallagher & Co.*, 371 F. Supp. 3d 983, 994 (D. Utah 2019) (citing *Alf*, 850 P.2d at 1274).

[79] *Alf*, 850 P.2d at 1275.

[80] *Utah Farm Bureau Ins. v. Crook*, 1999 UT 47, ¶ 6, 980 P.2d 685.

[81] *Sharon Steel Corp. v. Aetna Cas. & Sur.*, 931 P.2d 127, 133 (Utah 1997).

[82] *Fire Ins. Exch. v. Estate of Therkelsen,* 2001 UT 48, ¶ 22, 27 P.3d 555.

the four corners of the insurance policy."[83] Nonetheless, extrinsic evidence may be admissible

depending on the insurance policy's terms.[84] "If the parties make the duty to defend dependent

on the *allegations* against the insured, extrinsic evidence is irrelevant" and inadmissible.[85] If, on

the other hand, "the parties make the duty to defend dependent on whether there is actually a

'covered claim or suit,'" a court may consider extrinsic evidence.[86] "In other words, the key

question is whether the duty-to-defend clause 'is triggered by the facial language of a complaint

or whether the clause is triggered by the actual facts underlying the complaint.'"[87]

AOI argues that the language of Coverage A allows the Court to consider extrinsic

evidence. Notably, AOI did not raise this argument until its Reply, to which it attached such

extrinsic evidence. AOI urges the Court to consider this evidence in finding that AOI lacks a

duty to defend the Consolidated Action. "[A]rguments raised for the first time in a reply brief are

generally deemed waived."[88] However, the Paparazzi Parties had opportunity to respond to this

argument—and did so—in their Objection to the extrinsic evidence, and the Court finds it

necessary to address the issue to determine the parameters of the Court's review on summary

judgment. AOI's argument is, in any event, unavailing.

Here, Coverage A provides that "[AOI] will pay those sums that the insured becomes

legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which

this insurance applies. [AOI] ha[s] the right and duty to defend the insured against any 'suit'

---

[83] *Headwaters Res., Inc.*, 770 F.3d at 891.
[84] *Estate of Therkelsen,* 2001 UT 48, at ¶ 25.
[85] *Id.* (emphasis in original).
[86] *Id.*
[87] *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1172 (10th Cir. 2010) (quoting *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2009 UT App 200, ¶ 6, 216 P.3d 971).
[88] *U.S. v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011).

seeking those damages."[89] AOI, in a cursory fashion, asserts that this language does not impose a duty to defend solely based on the allegations in a complaint but requires the Court to determine whether the "suit" seeks damages "because of 'bodily injury' or 'property damage.'"[90] This argument ignores the meaning of the term "suit" as defined under the CGL Policy. The CGL Policy defines "suit" as "a civil proceeding in which damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are *alleged*.'"[91] And the Tenth Circuit has, in interpreting essentially identical language, held that this language makes the duty to defend dependent on the allegations such that the eight-corners rule applies. In *Bartile Roofs, Inc.*, the Tenth Circuit reasoned that the definition of the term "suit," which referred "to civil proceedings in which a party 'allege[s]' the existence of damages within the coverage of the applicable CGL policy[,]" "indicates that the duty to defend depends on the 'allegati[on][of] liability within the coverage afforded by the policy' rather than on a determination that the suit is actually covered by the policy."[92] Thus, here, where the term "suit" similarly refers to civil proceedings in which a party *alleges* damages within the coverage of the CGL Policy, the duty to defend depends on the allegations against the insured rather than whether a covered claim actually exists. Extrinsic evidence is, therefore, inadmissible, and the Court is limited to the corners of the applicable insurance policies and complaints. To that end, the Paparazzi Parties' Objection to the extrinsic evidence AOI offered in its Reply is sustained.

### The Consolidated Action

On March 27, 2026, the Court in the Consolidated Action dismissed without prejudice

---

[89] ECF No. 55, Ex. 10 at Auto-Owners_000174.

[90] *See id*.

[91] *Id*. at Auto-Owners_000187 (emphasis added).

[92] *Bartile Roofs, Inc.*, 618 F.3d at 1172 (quoting *Estate of Therkelsen*, 2001 UT 48 at ¶ 23).

the majority of the plaintiffs' claims and granted the plaintiffs' leave to file a Third Amended Class Action Complaint within thirty days of the Court's order.[93] This impacts the instant Motions because, as discussed above, the Court's analysis of AOI's duties to defend and indemnify is limited to the insurance policies and the complaint in the Consolidated Action. The parties in this action premised their arguments on the Second Amended Class Action Complaint, but that complaint has been in large part dismissed without prejudice and with leave to amend. The Third Amended Class Action Complaint has not yet been filed, and thus neither the parties nor the Court have had opportunity to examine how the new operative pleading may impact the issues at stake here. The Court cannot say with certainty that any amendments will not have substantive impact. As such, the Court finds that the issues of AOI's duties to defend and indemnify, as well as the Paparazzi Parties' counterclaims, are not ripe for review with respect to the Consolidated Action. The Court therefore dismisses without prejudice AOI's Motion for Summary Judgment and the Paparazzi Parties' Motion for Partial Summary Judgment as they relate to AOI's duties to defend and indemnify the Consolidated Action and to the counterclaims to the extent those counterclaims concern the Consolidated Action.[94] The parties may file renewed motions for summary judgment addressing these issues with respect to the Consolidated Action when the new pleading has been filed.

**The *Teske* Action and *Souza* Arbitration**

While the issues concerning AOI's duties to defend and indemnify the Consolidated Action are not yet ripe for review, the Court will endeavor to give the parties clarity on the

---

[93] *Johnson et al v. Paparazzi LLC*, No. 2:22-cv-00439-AMA-PK, ECF No. 117.

[94] However, the Court finds that AOI's request for declaratory judgment concerning reimbursement of its defense costs is ripe for review with respect to all of the Underlying Actions, as this issue does not turn on the allegations of the underlying complaints. Thus, the Court will, in the present Order, address this issue in relation to all of the Underlying Actions.

claims with respect to the *Teske* Action and *Souza* Arbitration.

## A.    MOOTNESS

The Paparazzi Parties contend that AOI's request for declaratory relief on its duty to defend the *Teske* Action and *Souza* Arbitration is moot because the defense of those actions has concluded. Indeed, both the *Teske* Action and *Souza* Arbitration have been dismissed with prejudice.

Article III of the U.S. Constitution "gives federal courts the power to adjudicate only genuine Cases and Controversies."[95] "Claims become moot and must be dismissed without prejudice for lack of subject-matter jurisdiction 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'"[96] "In the insurance context, courts have held that claims alleging duties to defend or indemnify can become moot when the underlying litigation has been dismissed."[97]

First addressing the requests for declaratory relief on AOI's duty to indemnify against any judgment in the now-dismissed *Teske* Action and *Souza* Arbitration, under Utah law, the duty to indemnify "is tied to the existence of covered claims"[98] and "relates to liability *actually imposed* on the insured for claims falling within the scope of coverage."[99] "[T]he duty to indemnify [is] determined by the underlying facts of the case."[100] As the *Teske* Action and *Souza*

---

[95] *Robert v. Austin*, 72 F.4th 1160, 1163 (10th Cir. 2023).

[96] *Invictus Unlimited v. Fed. Ins. Co.*, No. 1:24-cv-00421-LF-GBW, 2025 WL 1208201, at *3 (D.N.M. Apr. 25, 2025), *appeal dismissed*, No. 25-2056, 2025 WL 3459729 (10th Cir. Sept. 9, 2025) (quoting *Robert*, 72 F.4th at 1163).

[97] *Id*. at *4 (collecting cases).

[98] *Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 28, 140 P.3d 1210.

[99] *Aspen Specialty Ins. Co. v. Utah Loc. Gov'ts Tr.*, 954 F. Supp. 2d 1311, 1316 (D. Utah 2013) (emphasis in original).

[100] *Summerhaze Co., L.C. v. Fed. Deposit Ins. Corp.*, 2014 UT 28, ¶ 36, 332 P.3d 908 (citation modified).

Arbitration were dismissed with prejudice as stipulated by those parties, there was never a judicial determination on the factual existence of covered claims in those proceedings, and there was in those proceedings no judgment entered actually imposing liability on AOI for covered claims. Given the dismissal of the *Teske* Action and *Souza* Arbitration "and the absence of a judgment triggering an indemnity obligation, there is no live case or controversy that would entitle [AOI] to a declaratory judgment[,]"[101] and thus AOI's request for such a declaratory judgment with respect to the *Teske* Action and *Souza* Arbitration is moot. Similarly, to the extent the Paparazzi Parties' counterclaim for declaratory judgment seeks a declaration that AOI has a duty to indemnify the *Teske* Action and *Souza* Arbitration, it is also moot. Therefore, the Court dismisses without prejudice for lack of subject matter jurisdiction AOI's claim and the Paparazzi Parties' counterclaim seeking declaratory judgment on AOI's duty to indemnify the *Teske* Action and *Souza* Arbitration.

The requests for declaratory judgment on AOI's duty to defend the *Teske* Action and *Souza* Arbitration still, however, present justiciable questions despite that those proceedings were dismissed with prejudice. AOI seeks declaratory judgment that it is entitled to reimbursement from the Paparazzi Parties for defense costs premised on the allegation that it had no duty to defend the Paparazzi Parties. Similarly, the Paparazzi Parties seek a determination that AOI owes them unpaid defense-related costs premised, conversely, on the allegation that AOI indeed had such a duty to defend. Moreover, the Paparazzi Parties' counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing are premised on AOI's alleged breach of the duty to defend. Whether AOI had a duty to defend the *Teske* Action and

---

[101] *Scottsdale Ins. Co. v. Jian Li Structure, Inc.*, No. 18-cv-01744-PKC-SJB, 2020 WL 5622201, at *8 (E.D.N.Y. Aug. 28, 2020).

*Souza* Arbitration is a threshold question to these requests, and thus it is a live question that the Court has jurisdiction to resolve under Article III.[102] The Court will therefore address AOI's purported duty to defend the *Teske* Action and *Souza* Arbitration below.

## B.    DUTY TO DEFEND

To reiterate, a duty to defend arises "when the insurer ascertains facts giving rise to potential liability under the insurance policy."[103] "When the allegations, if proven, show there is no potential liability [under the policy], then there is no duty to defend."[104] "If one claim or allegation triggers the duty to defend, the insurer must defend all claims (that is, covered and non-covered claims), at least until the suit is limited to the non-covered claims."[105] "When in doubt, defend."[106]

The Paparazzi Parties argue that Coverage A of the CGL Policy,[107] the EPL Endorsement, and the Umbrella Policy impose upon AOI a duty to defend the *Teske* Action and *Souza* Arbitration. AOI contends that the allegations in the *Teske* Complaint and *Souza* Statement of Claims do not, when compared to the Policies' language, give rise to such a duty. The Court will first analyze the CGL and Umbrella Policies before turning to the EPL Endorsement.

---

[102] *See Robert*, 72 F.4th at 1163 (suggesting that, where the parties have a "legally cognizable interest in the outcome," the case is not moot); *United Fin. Cas. Co. v. Kan. E3, LLC*, No. 24-cv-05094-CDC, 2024 WL 3345367, at *4 (W.D. Ark. July 9, 2024) (holding that an insurance dispute was not moot because, "though the Underlying Suit has been dismissed, [the insureds] have not withdrawn their request for defense[, and the parties] continue to dispute whether coverage [for the duty to defend] exists").

[103] *Sharon Steel Corp.*, 931 P.2d at 133.

[104] *Cincinnati Ins. Co. v. AMSCO Windows*, 921 F. Supp. 2d 1226, 1235 (D. Utah 2013) (citation modified).

[105] *Id.* at 1236.

[106] *Benjamin,* 2006 UT 37 at ¶ 22.

[107] The Paparazzi Parties concede that AOI does not owe a duty to defend under Coverage B of the CGL Policy. ECF No. 61 at 3 n.1.

*1.      CGL and Umbrella Policies*

The terms of Coverage A of the CGL Policy provide that

> [t]his insurance applies to "bodily injury" and "property damage" only if:
>     (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>     (2) The "bodily injury" or "property damage" occurs during the policy period[.][108]

"Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[109] "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[110]

Similarly, the terms of the Umbrella Policy provide that

> **A. [w]e** will pay those sums included in **ultimate net loss** that the **insured** becomes legally obligated to pay as damages because of:
> **1. Bodily injury;**
> **2. Property damage;**
> **3. Personal injury; or**
> **4. Advertising injury**
> to which this insurance applies caused by an **incident**.[111]

Incident is defined as follows:

> "either an occurrence or an offense, whichever is the basis of coverage, then:
>         1. [w]hen coverage applies on an occurrent basis, **incident** means an accident with respect to:
>                 a. **[b]odily injury**, including damages claimed by any person or organization for care, loss of services or death, resulting at anytime from the **bodily injury**; or
>                 b. **[p]roperty damage**[.][112]

---

[108] ECF No. 55, Ex. 10 at Auto-Owners_000174.
[109] *Id*. at Auto-Owners_000184.
[110] *Id*. at Auto-Owners_000186.
[111] *Id*. Ex. 11 at Auto-Owners_000221–222 (emphasis in original).
[112] *Id*. at Auto-Owners_000218 (emphasis in original).

"Bodily injury" under the Umbrella Policy means "bodily injury, bodily sickness or bodily disease sustained by a person, including death resulting from any of these at any time."[113]

With respect to bodily injury, the parties seem to agree that the *Souza* Statement of Claims seeks damages from the Paparazzi Parties because of "bodily injury." Indeed, the Statement of Claims alleges that the design and manufacturing defects in the "Lead-Laden Jewelry" were "proximate cause[s] of Souza's Symptoms and further caused [her] extreme pain and suffering."[114] While vague, the term "Symptoms" suggests that Ms. Souza is claiming injury because of bodily injury, sickness, or disease.

Whether the *Teske* Complaint seeks damages for bodily injury is another matter. The Paparazzi Parties point to the allegation that Ms. Teske "began to have suspicions that the jewelry was not safe when, after purchasing Paparazzi jewelry, she began experiencing headaches and vertigo for the first time in her life[]"[115] to support their contention that the *Teske* Complaint seeks damages for bodily injury. However, while headaches and vertigo may constitute bodily injury, it does not appear to the Court that Ms. Teske premises her requests for damages on either headaches or vertigo. In the Prayer for Relief, the plaintiffs request, in relevant part, "an award of funds sufficient to carry out a national corrective advertising campaign to mitigate the *reputational harm* Defendants' wrongful conduct has caused";[116] an award "in the amount of the *difference between the (worthless) value* of lead-and nickel-containing Paparazzi accessories *and the market price of the product* that [p]laintiffs . . . actually paid for:" lead- and nickel-free costume jewelry as advertised;[117] and awards for "the *lost profit*

---

[113] *Id*. at Auto-Owners_000217.

[114] ECF No. 55, Ex. 6 ¶¶ 125, 132.

[115] ECF No. 55, Ex. 5 ¶ 15.

[116] *Id*. at 32 ¶ E (emphasis added).

[117] *Id*. at 32 ¶ H (emphasis added).

*value* to plaintiffs . . . that they would have earned had they sold each of the accessory pieces that [d]efendants sold to them."[118] Thus, it seems that the *Teske* Complaint seeks damages *because of* reputational and economic damages rather than damages *because of* bodily injury.

In any event, even assuming that both the *Teske* Complaint and *Souza* Statement of Claims allege bodily injury, the Court finds that neither allege an "occurrence" or an "incident" as required to give rise to AOI's duty to defend under the language of the CGL and Umbrella Policies. Under the terms of the Coverage A, "occurrence" means "an accident[.]"[119] Similarly, under the terms of the Umbrella Policy, "incident," "[w]hen coverage applies on an occurrent basis, . . . means an accident."[120] The Policies do not further define the term "accident," but "the Utah Supreme Court has construed the term in the insurance context as being 'descriptive of means which produce effects which are not their natural and probable consequences.'"[121] "Under this definition, 'harm or damage is not accidental if it is the natural and probable consequence of the insured's act or should have been expected by the insured.'"[122] "Th[is] generally presents a legal question as to what the average individual would expect to happen under the circumstances."[123] In analyzing this question, Utah courts "look to whether the injury, rather than the act giving rise to the injury, is accidental."[124] "As long as some sort of injury was intended or expected, the actual injury suffered is not accidental even if the actual injury differs in nature or degree from what might have been reasonably anticipated."[125] Furthermore, the Tenth Circuit

---

[118] *Id*. at 32 ¶¶ J–K (emphasis added).
[119] ECF No. 55, Ex. 10 at Auto-Owners_000186.
[120] *Id*. Ex. 11 at Auto-Owners_000218.
[121] *Owners Ins. Co. v. Greenhalgh Plan. & Dev., Inc.*, No. 22-4008, 2023 WL 4994512, at *3 (10th Cir. Aug. 4, 2023) (quoting *N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, ¶ 6, 175 P.3d 566).
[122] *Id*. (quoting *N.M.*, 2008 UT 1 at ¶ 7).
[123] *Id*. (alterations in original).
[124] *N.M.*, 2008 UT 1 at ¶ 12.
[125] *Id*.

has, in examining these issues under Utah law, stated that "the natural results of an insured's unworkmanlike or negligent construction" do not "constitute an occurrence (i.e., accident) triggering coverage under a CGL policy."[126]

The Paparazzi Parties argue that the *Teske* Complaint and *Souza* Statement of Claims allege an occurrence under the Policies because they allege negligent conduct on behalf of the Paparazzi Parties. Certainly, neither the *Teske* Complaint nor the *Souza* Statement of Claims seem to go so far as to allege that the Paparazzi Parties set forth with some kind of intention to cause bodily harm. But it is not whether the Paparazzi Parties' conduct was intentional or negligent that is significant—what matters is whether the average individual would expect the bodily injury to result from the conduct. Again, Utah courts "look to whether the injury, rather than the act giving rise to the injury, is accidental."[127] Here, the allegations in both the *Teske* Complaint and the *Souza* Statement of Claims make clear that the bodily injuries alleged— headaches, vertigo, and symptoms of sickness—are natural and probable consequences of the Paparazzi Parties' selling jewelry and accessories contaminated with metals toxic to human health.

Looking first to the *Teske* Complaint, it is alleged that Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve "knew" that Paparazzi was falsely misrepresenting its products as lead- and nickel-free when those products in fact contained dangerous levels of lead, nickel, and other toxic metals, but they "disregarded" those dangers.[128] It is further alleged that the HHS, CDC, NIOSH, ATSDR "all agree" that "lead is exceedingly dangerous. Even if a person is exposed for only a short period of time, and even through only skin contact, a person may experience

---

[126] *Bartile Roofs, Inc.*, 618 F.3d at 1174 n.17.
[127] *N.M.*, 2008 UT 1 at ¶ 12.
[128] ECF No. 55, Ex. 5 ¶¶ 24–28.

abdominal pain, constipation, headaches, irritability, loss of appetite, memory loss, pain or tingling in the hands and/or feet, and general weakness."[129] As for nickel, according to the *Teske* Complaint, the "HHS, CDC, NIOSH, and ATSDR agree that nickel is a known human toxin" that can enter the bloodstream through skin contact, which can cause chronic bronchitis, reduced lung function, and cancer of the lung and nasal sinus.[130] The "HHS, CDC, NIOSH, and ATSDR" also identify cadmium as a toxin, and it is classified by the HHS as a known carcinogen.[131] "Common injuries for cadmium exposure include kidney and lung damage."[132] From these allegations, it does not appear that physical illness experienced after purchasing jewelry containing dangerous levels of toxic metals can truly be termed accidental. Rather, it seems that the average person would expect that, when jewelry contaminated with toxic metals is being sold, consumers purchasing that jewelry are going to become sick. Because the bodily injury here is the natural and probable consequence of the Paparazzi Parties' actions, it is not an "accident" and is thus neither an "occurrence" nor an "incident."

Similarly, the *Souza* Statement of Claims alleges that Misty Kirby, Trent Kirby, Chantel Reeve, and Ryan Reeve "knew of Paparazzi's false representations[;] knew that Paparazzi's jewelry and accessories contained toxic metals, including lead and nickel[;] and disregarded those dangers."[133] It further alleges that the Paparazzi Parties "knew, or in the exercise of reasonable due care, should have known of the manufacturing and/or design defects of the Lead-Laden Jewelry and that it was likely to be dangerous for the use for which it was intended[]"[134]

---

[129] *Id.* ¶ 41.
[130] *Id.* ¶ 44.
[131] *Id.* ¶ 45.
[132] *Id.*
[133] ECF No. 55, Ex. 6 ¶¶ 44–47.
[134] *Id.* ¶ 141.

and that the Paparazzi Parties "knew, or in the exercise of reasonable care, should have known that the Lead-Laden Jewelry was unfit for the purposes for which it was used."[135] According to the *Souza* Statement of Claims, "[l]ead is a known human carcinogen capable of being absorbed in the human body and stored in human tissue, bones, and blood."[136] "Even a brief exposure to lead through skin contact can result in abdominal pain, constipation, headaches, hyperirritability, loss of appetite, memory loss, pain or tingling in the hands or feet, general weakness, seizures, coma, or even death."[137] Similarly, nickel has "been classified as a human carcinogen[,]" and "[n]ickel exposure can result in chronic bronchitis, reduced lung function, and kidney damage."[138] And "[n]ot only did the products contain lead and nickel—often in amounts that exceed applicable safety thresholds—they contained other heavy and dangerous metals, including cadmium, mercury, and arsenic."[139] As above, based on these allegations, it cannot be said that physical illness experienced after purchasing jewelry containing dangerous levels of toxic metals can truly be termed accidental. Rather, when selling products contaminated with metals known to be dangerous to human health, the average person would expect consumers to become sick. Because the bodily injury here is the natural and probable consequence of the Paparazzi Parties' actions, it is not an "accident" and is thus neither an "occurrence" nor an "incident."

In sum, for the reasons above, the *Teske* Complaint and the *Souza* Statement of Claims do not allege an "occurrence" or an "incident" that would trigger AOI's duty to defend those actions

---

[135] *Id.* ¶ 142.
[136] *Id.* ¶ 37.
[137] *Id.* ¶ 48.
[138] *Id.* ¶¶ 41–42.
[139] *Id.* ¶ 8.

under the terms of either Coverage A of the CGL Policy or the Umbrella Policy. Therefore, AOI

does not have a duty to defend the *Teske* Action or *Souza* Arbitration under those Policies.[140]

> 2.      *EPL Endorsement*

The terms of the EPL Endorsement provide that

> 1. We have the right and duty to defend and appoint an attorney to defend any "claim" or "suit" brought against any insured for a "wrongful employment act" to which this insurance applies, even if the "claim" or "suit" is groundless or fraudulent.[141]

"Wrongful employment act" is defined as follows:

> Q. "Wrongful employment act" means any actual or alleged:
> 1. Wrongful dismissal, discharge or termination (either actual or constructive), including breach of implied contract;
> 2. Harassment (including sexual harassment, whether quid pro quo, hostile work environment or otherwise);
> 3. Discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);
> 4. "Retaliation" (including lockouts);
> 5. Employment-related misrepresentation(s) to your "employee", "recognized volunteer" or applicant for employment with you;
> 6. Employment-related:
>     a. Libel, slander or defamation;
>     b. Humiliation;
>     c. Mental anguish;
>     d. Invasion of privacy; or
>     e. Intentional infliction of emotional distress;
> 7. Wrongful failure to employ or promote;
> 8. Wrongful deprivation of career opportunity; wrongful demotion or negligent "employee" evaluation, including the giving of negative or defamatory statements in connection with an "employee" reference;
> 9. Wrongful discipline;
> 10. Failure to provide or enforce adequate or consistent policies and procedures relating to any "wrongful employment act";
> 11. Negligent supervision or hiring by an insured, relating to any of the above; or

---

[140] Because the Court finds that no "occurrence" or "incident" has been alleged in the *Teske* Action and *Souza* Arbitration, the Court need not reach whether any of the CGL or Umbrella Policies' exclusions would apply.
[141] ECF No. 55, Ex. 10 at Auto-Owners_000162.

12. Violation of an individual's civil rights relating to **1.** through **11.** above.[142]

The Paparazzi Parties contend that the *Teske* Complaint and *Souza* Statement of Claims allege "employment-related misrepresentation(s) to [Paparazzi's] 'employee', 'recognized volunteer' or applicant for employment"[143] sufficient to trigger AOI's duty to defend. Certainly, both the *Teske* Action and the *Souza* Arbitration are premised on the allegation that the Paparazzi Parties misrepresented to Consultants and the public that its products were lead- and nickel-free. The question, then, is whether these misrepresentations were "employment related." The Court finds that they were not.

The EPL Endorsement does not appear to separately define "employment-related."[144] The Tenth Circuit, in addressing employment-related defamation, cited to *Alexandra House, Incorporated v. St. Paul Fire & Marine Insurance Company*, 419 N.W.2d 506, 510 (Minn. Ct. App. 1988), which supports a narrowed reading of the term.[145] In *Alexandra House, Inc.*, the court stated "that defamation is employment related only if the statement is directly linked to the employee's ability to effectively perform his or her job."[146] The Tenth Circuit then found that complaints that led to the review of an individual's employment and, ultimately, to his discharge were employment-related statements—the statements "addressed . . . continued employment, discipline, potential discharge, or justification for [the employer's] decision to discharge [the employee]."[147]

---

[142] *Id.* at Auto-Owners_000170.
[143] *See id.*
[144] *See id.* at Auto-Owners_000169.
[145] *Moroni Feed Co. v. Mut. Serv. Cas. Ins. Co.*, 287 F.3d 1290, 1293–94 (10th Cir. 2002).
[146] *Alexandra House, Inc.*, 419 N.W.2d at 510.
[147] *Moroni Feed Co.*, 287 F.3d at 1293–94.

Reading the term to refer to matters that directly concern the employment relationship itself is supported by the decisions of other courts. Although looking at the term in the context of an employment-related exclusion, the court in *Peterborough Oil Company v. Great American Insurance Company*, 397 F. Supp. 2d 230, 238–39 (D. Mass. 2005) found that that "the term 'employment-related' has a relatively narrow meaning: it is intended to refer to matters that directly concern the employment relationship itself, such as the demotion, promotion, or discipline of employees by employers, and tortious acts that may accompany such personnel decisions, such as discrimination, harassment, or defamation." "Conversely, it is not intended to refer to all matters that concern or relate to employees."[148] And in addressing "employment-related misrepresentation[s]," it appears that courts have interpreted the term as referring to matters directly related to the employment relationship itself such that it would include misrepresentations about compensation and employment status.[149]

Significantly, the Paparazzi Parties do not provide more than cursory argument that "employment-related" should be read so broadly that it would include a business's advertisements about its product made to the public at large, employees and nonemployees alike. While the Paparazzi Parties cite *YS Garments*, this case does not help them. There, the misrepresentations appear to have been related to the individual's equity status in the company,

---

[148] *Peterborough Oil Co.*, 397 F. Supp. 2d at 239.

[149] *See, e.g., Smith v. Philadelphia Indem. Ins. Co.*, 799 F. Supp. 3d 1161, 1164 (D. Colo. 2025) ("[T]he civil theft claim is premised on commission misrepresentations, placing the claim squarely under the . . . 'misrepresentation' provision."); *Pro. Sec. Consultants, Inc. v. U.S. Fire Ins. Co.*, No. CV 10-04588 SJO SSX, 2010 WL 4123786, at *3 (C.D. Cal. Sept. 22, 2010) ("The Policy provides coverage for 'any employment-related misrepresentation[]' . . . The facts in the Underlying Action specifically allege that Plaintiff '[d]isseminated false information . . . that . . . the members of the Illegal Wages Class were not entitled to overtime compensation.'"); *YS Garments v. Cont'l Cas. Co.*, No. CV 17-03345 SJO JEMX, 2018 WL 3830178, at *1, 8 (C.D. Cal. July 13, 2018) (finding employment-related misrepresentations where the underlying lawsuit alleged that the plaintiff had been promised "a 50% interest in the company").

which pertained to his employment relationship with that company.[150] Moreover, the Paparazzi

Parties do not appear to assert that the term "employment-related" is ambiguous. Thus, the Court

finds that, by its plain and ordinary meaning, "employment-related" refers to matters that directly

concern the employment relationship itself such as promotion, discharge, compensation, and

discipline.

Here, according to the *Teske* Complaint, as recently as November 2021, Paparazzi

advertised its products to Consultants and consumers as being lead- and nickel-free and as being

compliant with California's Proposition 65.[151] Similarly, the *Souza* Statement of Claims alleges

that "[f]or more than four years, Paparazzi represented to its Consultants and the general public

that all of Paparazzi's jewelry and accessories were 'lead and nickel free' and that its products

complied with applicable laws and rules limiting the amount of dangerous toxins in consumer

products."[152] Both the *Teske* Complaint and the *Souza* Statement of Claims allege that these were

misrepresentations. But even assuming that Ms. Teske, Ms. Franklin, Ms. Souza, and Ms. Carroll

fall, as Consultants, into the EPL Endorsement's definition of "employee," these

misrepresentations do not directly pertain to the specific employment relationships between

Paparazzi and the Consultants. In other words, the misrepresentations that the products were

lead- and nickel-free do not address "continued employment, discipline, potential discharge, or

justification for [the employer's] decision to discharge [the employee]."[153] Rather, these

misrepresentations were advertisements made generally to the public at large. As such, neither

the *Teske* Action nor the *Souza* Arbitration contain allegations constituting an "employment-

---

[150] *See YS Garments v. Cont'l Cas. Co.*, 2018 WL 3830178, at *1, 8.
[151] ECF No. 55, Ex. 5 ¶ 4.
[152] ECF No. 55, Ex. 6 ¶ 7.
[153] *Moroni Feed Co.*, 287 F.3d at 1294.

related misrepresentation" and, in turn, a "wrongful employment act" that would trigger AOI's duty to defend under the EPL Endorsement. Therefore, AOI does not have a duty to defend the *Teske* Action or *Souza* Arbitration under the EPL Endorsement.[154]

In sum, AOI does not have a duty to defend the *Teske* Action or *Souza* Arbitration under Coverage A of the CGL Policy, the EPL Endorsement, or the Umbrella Policy. Accordingly, the Court grants summary judgment in AOI's favor to the extent it seeks a declaration that it does not owe a duty to defend the *Teske* Action or *Souza* Arbitration. Furthermore, the Paparazzi Parties' request for a determination that AOI owes the Paparazzi Parties defense-related costs fails to the extent the request seeks costs related to the *Teske* Action and *Souza* Arbitration. AOI "cannot be held responsible for legal costs and fees it had no duty to provide in the first instance."[155]

## D.    BREACH OF CONTRACT & BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

In Utah, "a plaintiff may sue on a contract for: (1) breach of the contract's express terms; and/or (2) breach of the covenant of good faith and fair dealing, which is an implied duty that inheres in every contractual relationship."[156]

### 1.  Breach of Contract

As explained above, the Court has found that AOI had no duty to defend the *Teske* Action or *Souza* Arbitration. Without the existence of a duty to defend, the Paparazzi Parties "cannot

---

[154] Because the Court holds that neither the *Teske* Action nor the *Souza* Arbitration allege a "wrongful employment act," it need not reach whether any "wrongful employment acts" took place after the Retroactive Date or whether any exclusions apply.

[155] *Hartford Cas. Ins. v. Swapp L., PLLC*, No. 2:17-cv-01130, 2019 WL 3500520, at *4 (D. Utah Aug. 1, 2019).

[156] *Travelers Prop. Cas. Co. of Am. v. Fed. Recovery Servs., Inc.*, 156 F. Supp. 3d 1330, 1337 (D. Utah 2016).

prevail on [their] breach of contract counterclaim"[157] to the extent it is premised on AOI's breach of a duty to defend the *Teske* Action or *Souza* Arbitration. As such, the Court grants summary judgment in AOI's favor on the Paparazzi Parties' breach of contract counterclaim with respect to the *Teske* Action and *Souza* Arbitration.

### 2. *Beach of the Covenant of Good Faith and Fair Dealing*

"Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract."[158] The Utah Supreme Court has held that "when an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant of good faith if it chooses to do so."[159] "Therefore, an insurer cannot be held to have breached the covenant of good faith on the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied."[160]

Here, the Paparazzi Parties' counterclaim is premised on AOI's refusing to immediately, fully, and entirely defend the Underlying Actions and thus wrongfully denying policy benefits.[161] The Court has, however, found that AOI does not owe a duty to defend the *Teske* Action or *Souza* Arbitration. AOI cannot have breach the covenant of good faith and fair dealing by failing to provide benefits that were not owed. Therefore, the Court grants summary judgment in AOI's favor on the Paparazzi Parties' breach of the covenant of good faith and fair dealing counterclaim with respect to the *Teske* Action and *Souza* Arbitration.

---

[157] *Id*.
[158] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199–200.
[159] *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 7, 286 P.3d 301 (citation modified).
[160] *Id*. (citation modified).
[161] *See* ECF No. 18 ¶¶ 39, 47.

**AOI's Request for Reimbursement of Defense Costs**

In Utah, "an insurance company presented with an insured's tender of defense that believes" the underlying action falls outside of the insurance policy's coverage "has two options: the insurer may either protect its interests through a declaratory judgment proceeding asking the court to determine coverage under an insurance policy, or it may defend the suit under a reservation of its right to seek repayment later."[162] However, in addressing the right to reimbursement under a reservation of rights in the context of a claim brought by an insurer to recover amounts paid in excess of policy limits, the Utah Supreme Court explained that "there can be no extracontractual right to restitution between the insurer and its insured, and only the express terms of a policy create an enforceable right to reimbursement."[163] In other words, "an insurer's right to recover reimbursement from an insured may only arise, if at all, under the written terms of their insurance policy."[164]

AOI contends that "[a]t this stage, [it] has not requested reimbursement of defense costs incurred in the Underlying Action[s]."[165] But AOI's First Amended Complaint states, under the fourth claim for relief, that "AOI is entitled to reimbursement from [the Paparazzi Parties] for any and all sums spent in providing a defense to [the Paparazzi Parties] in the [Underlying Actions]."[166] AOI's First Amended Complaint also seeks relief in the form of the Court's "[d]eclaring that [AOI] is entitled to reimbursement of all amounts paid to or on behalf of [the

---

[162] *Hartford Cas. Ins.*, 2019 WL 3500520, at *3 (citation modified).
[163] *U.S. Fid. v. U.S. Sports Specialty*, 2012 UT 3, ¶ 21, 270 P.3d 464.
[164] *Id*. ¶ 18.
[165] ECF No. 61 at 37.
[166] ECF No. 4 at ¶ 129.

32

Paparazzi Parties] related to the [Underlying Actions,]"[167] and AOI's Motion for Summary Judgment asks the Court to grant summary judgment in its favor on its declaratory judgment claims and to enter the relief requested in the First Amended Complaint.[168] Additionally, the Paparazzi Parties seek summary judgment on AOI's claim for reimbursement. Thus, it appears that this issue is presently before the Court.

Furthermore, the Court finds it appropriate to address the claim for reimbursement with respect to all three Underlying Actions. AOI's claim for reimbursement is premised on the allegation that it had no duty to defend the Underlying Actions. The Court has found that AOI had no duty to defend the *Teske* Action or *Souza* Arbitration. And even assuming without deciding that AOI has no duty to defend the Consolidated Action, the Court agrees with the Paparazzi Parties that AOI is not entitled to reimbursement of defense costs absent any provisions stating such in the Policies.

As a threshold matter, to the extent AOI attempts to premise its claim for reimbursement on a theory of unjust enrichment, the claim fails. "Under Utah law, an insurer may not seek restitution based on the extracontractual theory of unjust enrichment where there is an express contract governing the 'subject matter' of the dispute."[169] "An insurance policy is a contract that defines the risk relationship of the insurer and the insured."[170] "The right to reimbursement would alter this risk relationship, and therefore the right falls squarely within the 'subject matter'

---

[167] *Id.* at 49.

[168] ECF No. 54 at 42.

[169] *U.S. Fid.*, 2012 UT 3 at ¶ 21.

[170] *Id.*

of the policy."[171] Here, it is undeniable that an express contract governing the relationship between AOI and the Paparazzi Parties exists in the form of the Policies. [172]

The parties do not appear to dispute that the Policies do not contain any provisions entitling AOI to seek reimbursement from an insured—certainly, AOI has not directed the Court to any such provision. AOI, however, claims that *U.S. Fidelity* is not controlling, as it "pertain[s] to circumstances where an insurer sought reimbursement for amounts paid on a *covered* claim."[173] This oversimplifies the case. In *U.S. Fidelity*, the insurer sought reimbursement under reservation of rights for amounts paid *over* the policy limit in relation to a civil judgment. In other words, the insurer sought reimbursement for amounts paid beyond its policy obligations, just as AOI seeks reimbursement for amounts paid beyond its policy obligations. And the Utah Supreme Court's decision in *U.S. Fidelity* is clear "that an insurer's right to recover reimbursement from an insured may only arise, if at all, under the written terms of their insurance policy."[174] It does not appear to the Court that the Utah Supreme Court limited its decision to only certain circumstances in the insurance context. Indeed, in *Hartford*, a court within the District of Utah noted that, while the issue of the insurer's right to reimbursement was not presently before the court, "*U.S. Fidelity* . . . casts serious doubt on the validity of [the

---

[171] *Id.*

[172] Furthermore, the Utah Insurance Codes provides that "an insurance policy may not contain any agreement or incorporate any provision not fully set forth in the policy or . . . made a part of the policy at the time of its delivery." *U.S. Fid.*, 2012 UT 3 at ¶ 16 (quoting Utah Code Ann. § 31A-21-106(1)(a)). "The purpose of this requirement is to ensure that the entire insurance contract is contained in one document so that the insured can determine from the policy exactly what coverage he or she has." *Id.* (citation modified).

[173] ECF No. 60 at 38 (emphasis in original).

[174] *U.S. Fid*, 2012 UT 3 at ¶ 18.

insurer's] extracontractual, unilateral reservation of rights to seek reimbursement of attorneys' fees it has already paid."[175]

Significantly, AOI has failed to cite any case law in support of its position, and AOI has failed to offer any other theory under which it would be entitled to reimbursement. This Court cannot then disregard the Utah Supreme Court's strong language that "an insurer's claim to an unbargained-for right to reimbursement from its insured presents a perverse manipulation of risk that has no place in our law."[176] As the Policies do not contain any provisions entitling AOI to seek reimbursement for defense costs from the Paparazzi Parties, AOI is not entitled under Utah law to seek such costs with respect to the Underlying Actions. Summary judgment in the Paparazzi Parties' favor is warranted on this claim.

## ORDER

For the foregoing reasons, the Court GRANTS IN PART, DENIES IN PART, AND DIMISSES WITHOUT PREJUIDCE IN PART AOI's Motion for Summary Judgment (ECF No. 54) and the Court GRANTS IN PART, DENIES IN PART, AND DISMISSES WITHOUT PREJUDICE IN PART the Paparazzi Parties' Motion for Partial Summary Judgment (ECF No. 56) as follows:

1.  To the extent the Motions address AOI's duties to defend and indemnify the Consolidated Action, the Motions are dismissed without prejudice. Similarly, to the extent the Motions address the Paparazzi Parties' counterclaims with respect to the Consolidated Action, the Motions are dismissed without prejudice. The parties may

---

[175] *Hartford*, 2019 WL 3500520, at *5 n.4.
[176] *U.S. Fid*, 2012 UT 3 at ¶ 17.

file renewed motions for summary judgment addressing these issues when the new amended pleading has been filed in the Consolidated Action.

2. With respect to the *Teske* Action and *Souza* Arbitration, the requests concerning AOI's duty to indemnify those actions are dismissed without prejudice for lack of subject matter jurisdiction.

3. With respect to the *Teske* Action and *Souza* Arbitration, summary judgment on the issue of AOI's duty to defend is granted in AOI's favor. AOI owes no duty to defend the *Teske* Action or *Souza* Arbitration.

4. With respect to the *Teske* Action and *Souza* Arbitration, summary judgment on the Paparazzi Parties' breach of contract counterclaim is granted in AOI's favor.

5. With respect to the *Teske* Action and *Souza* Arbitration, summary judgment on the Paparazzi Parties' breach of the covenant of good faith and fair dealing is granted in AOI's favor.

6. Summary judgment is granted in the Paparazzi Parties' favor on AOI's request for declaratory relief concerning reimbursement of defense costs. AOI is not entitled to defense costs for defending the Underlying Actions.

DATED this 31st day of March 2026.      BY THE COURT:


Ann Marie McIff Allen
United States District Judge